The **CLEVELAND–CLIFFS IRON COMPANY**, a Corporation, Libelant,

v.

**GROSSE ILE BRIDGE COMPANY**, a Corporation, Respondent,

and

The **TUG SUPERIOR**, her engines, tackle, etc.,

and

The **Great Lakes Towing Company**, a Corporation, Impleaded Respondents.

No. 22335.

United States District Court
E. D. Michigan, S. D.

March 31, 1964.

On Motion to Reform Findings of Fact and Conclusions of Law

July 20, 1964.

John J. Hanninen, of McCreary, Hinslea & Ray, Cleveland, Ohio, Robert A. Jenkins, Detroit, Mich., for libelant.

Raymond A. Ballard, Foster, Meadows & Ballard, Walter J. Murray, Henry Murray, Detroit, Mich., for respondent Bridge Co.

George E. Bushnell, Jr., Miller, Canfield, Paddock & Stone, Detroit, Mich., Harvey B. Stover, Jr., Stover & Stover, Milwaukee, Wis., for impleaded respondents The Tug Superior and Great Lakes Towing Co.

MACHROWICZ, District Judge.

This is an action in admiralty by libelant, the Cleveland-Cliffs Iron Company, operator under a demise charter of the Steamer H. L. GOBEILLE, against respondent Grosse Ile Bridge Company as owner of the Grosse Ile Toll Bridge, for damages allegedly incurred when the steamer struck and rubbed against a pier of respondent's bridge.

Respondent interpleaded the Great Lakes Towing Company as owner of the Tug SUPERIOR which was assisting the steamer on a bow towline at the time of contact.

## PLEADINGS

The libel alleges that the GOBEILLE, loaded with a cargo of iron ore, was proceeding downbound at slow speed in the Trenton Channel of the Detroit River on May 15th, 1960, with the Tug SUPERIOR towing on a bow towline, through the east draw of the bridge; that there was a moderate northwest wind and the weather was clear; that at about 5:55 P.M. on that day the port side of the GOBEILLE made contact with and rubbed the east pier of the bridge; that a floating fender system was installed on the east pier or abutment of the bridge to protect vessels against damage by the hard concrete surface of the pier when passing through the draw of the bridge, because of strong currents which affect navigation and a bend in the channel which must be negotiated in that location; that the fender system failed to prevent the side of the steamer from coming into contact with the masonry surfaces of the pier below the water line due to its previously damaged and deteriorated condition, thus causing heavy damage to the vessel which required immediate repairs at the shipyard in Ecorse, Michigan, from May 16th to 21st, 1960. Total damages of Fifty-eight Thousand Six Hundred Thirty-six and 98/100 Dollars, ($58,636.98) are claimed, of which Forty-four Thousand Two Hundred Forty-seven and 51/100 Dollars ($44,247.-51) is for cost of repairs and dry-docking and Fourteen Thousand Three Hundred Eighty-nine and 47/100 Dollars ($14,389.47) for loss of use of the vessel.

Respondent Bridge Company is charged in the libel with the following faults: Negligence and inattention to their duties by those in charge of the bridge; failure to install and maintain a proper fender system; failure to properly maintain the existing fender system, to make timely examinations of the bridge in order to keep it in proper condition, and permitting it to deteriorate and become inadequate; failure to promptly and properly repair the fender system after its damage by another vessel on April 14, 1960; and failure to warn libelant and the GOBEILLE that the fender was damaged, or to notify governmental authorities to issue warnings to navigators about the fender.

In answer the respondent denies any fault on its part; it denies striking of the pier by the GOBEILLE, alleging that

if any damage did occur, it was caused by improper navigation of the GOBEILLE in attempting to pass through the bridge draw at too slow a speed to maintain steerage, in failing to signal the Tug SUPERIOR for assistance, in maintaining a faulty lookout, in failing to allow for the wind and current and to use the Tug MARYLAND then trailing astern of the GOBEILLE. It alleges that the bridge was in a good condition and also alleges that it had no knowledge of the alleged damage to the GOBEILLE nor was it afforded any opportunity to survey the vessel at any time.

In the petition for interpleader respondent imputes to the interpleaded respondent faults of improper towage in attempting to traverse the draw of the bridge at too slow a speed to maintain steerageway, permitting the GOBEILLE to set over against the east pier, failure to compensate for wind and current conditions, and faulty lookout.

Impleaded respondent denies any fault on the part of its tugs and, as a separate defense, sets forth its Tariff and limitation of liability in Article II thereof for delay to a served vessel, whether due to repairs of damages or other causes, to One Hundred Dollars ($100.00) per calendar day.

Libelant denies faults charged against the GOBEILLE.

All parties reserved the right to urge any faults or additional faults of the remaining parties in suit, as developed by the evidence. A stipulation was filed as to facts not in dispute, to be supplemented by proofs at trial on disputed factual issues.

This matter was tried before the Court and the Court, having read the pleadings and stipulation on file, having heard and examined the testimony, documents and exhibits presented by all sides and admitted into evidence, having considered briefs submitted by proctors, and being fully advised in the premises, enters its findings of fact and conclusions of law as follows:

## FINDINGS OF FACT

1. Libelant, Cleveland-Cliffs Iron Company, an Ohio Corporation, was at all times material hereto the operator of the Steamer H. L. GOBEILLE under a demise charter. The GOBEILLE is a merchant vessel of the United States engaged in the business of commerce and navigation upon the Great Lakes and tributary waters.

2. Respondent, Grosse Ile Bridge Company, a Michigan Corporation, at all times material hereto was the owner and operator of the Grosse Ile Toll Bridge located just below Wyandotte, Michigan. The bridge crosses the Trenton Channel of the Detroit River, running generally east and west and connecting the northern portion of the Island of Grosse Ile with the City of Trenton, Michigan.

3. Impleaded respondent - claimant, Great Lakes Towing Company, a New Jersey Corporation, was at all times material hereto the owner and operator of the Tugs SUPERIOR and MARYLAND.

4. The GOBEILLE is a conventional Great Lakes bulk freighter five hundred thirteen (513) feet long with a beam of sixty and two-tenths (60.2) feet, powered by a twenty-three hundred (2300) horsepower steam engine. The steamer's engine is operated by her engineering department in response to chadburn (automatic telegraph system) signals from her pilot-house to her engine room. The chadburn and also a telephone are mounted at the after end of the after cabin at the stern and the telephone immediately connects with the pilot-house upon one (1) ring. The GOBEILLE has a cant or tumblehome with her sides tapered inboard from the bottom or turn of her bilge to her upper sheer strake or main deck.

5. The Tug SUPERIOR is about eighty-one (81) feet long, has a breadth of about twenty (20) feet, and is powered with a one thousand (1000) horsepower Diesel engine which is directly controlled from her pilot-house so that its captain has complete control over the

engine speed as well as the steering apparatus without any intervention by the engineer in the engine room. The Tug MARYLAND has similar characteristics.

6. The Grosse Ile Toll Bridge is a swing bridge with a movable draw span supported by a center pivot pier and a rest pier on each end. The draw span rotates on the center pivot pier and when the bridge is opened, the ends of the swing span are positioned over protective cribs, one located at the upstream end and another at the downstream end of the open swing span.

7. The bridge has two draws, known as the east draw and the west draw, available for transportation. Each draw is one hundred twenty-five (125) feet wide. The east draw is involved in this suit.

8. The piers on the bridge are constructed of concrete. The pier on the east side of the east draw, referred to as the east pier, and the pier which is involved in this action, has a rectangular cross section except for a wedge-shaped projection on the upstream (called the icebreaker) to prevent accumulations of ice during cold weather. The piers on the bridge, including the east pier, are tapered on all four sides, narrower at the top and wider at the bottom of the river. The outreach formed by the taper of the east pier along the channel or west side thereof is from thirteen (13) inches to eighteen (18) inches, the diagonal outreach of the northwest corner is about four (4) feet, and the outreach of the icebreaker point at the upstream end is five (5) feet. The pier has two sections, the base of the pier which is partly above water, and a superstructure atop the base on which the bridge rests; the base protrudes only about one (1) foot seventeen (17) inches above the water line. The northwest corner of the east pier is shielded with steel plates and angle irons beneath the surface of the water, held with bolts and rivets set into the concrete pier. The center pivot pier is the west pier of the east draw.

9. The bridge is situated on a bend in the river. It does not span the river in a direction which is perpendicular to either the upper or the lower portions of the channel. The pivot pier, the east pier, and the swing span, when open, are not parallel with the center line of the channel. The upper and lower cribs of the center pier, however, are located to partially conform to the line of the channel rather than the east pier. This cant of the bridge is about sixteen (16) degrees off the perpendicular to the upper channel. The draw side, or west side, of the east pier is located at a similar angle to the line of the upper channel. The true course for a downbound vessel approaching the bridge draw in conformity with the contours of the channel is about two hundred fourteen (214) degrees; the true course of the channel immediately below the bridge is one hundred eighty (180) degrees. These physical contours of the bridge require vessels approaching the bridge from the north or upstream side to make a turn to the left or west after entering the draw. The actual degree of the left turn, however, depends upon the navigational course of the vessel negotiating the draw and turn.

10. There is a substantial current (one (1) to four (4) miles per hour) in the vicinity of the bridge which ordinarily causes vessels to set to the west and anticipation of this set is considered by navigators in charting a course for approaching and entering the draw.

11. The toll bridge was constructed in 1912 in conformity with the permit for its construction issued by the War Department. The original permit did not require any protective fender system around the piers. For many years after its construction navigation in that part of the channel consisted mainly of small craft. After erection of the McLouth Steel Company plant and its unloading dock in 1954, west of the channel and about a mile downstream of the bridge, large Great Lakes freighters commenced using the channel and the bridge draws to deliver raw materials to the McLouth

Steel dock, but encountered difficulties in traversing the draw.

12. In 1955, after discussions with the Lake Carriers Association, an organization of shipowners on the Great Lakes, respondent Bridge Company was requested by the United States Army Corps of Engineers to provide some protective system for the bridge piers. In the letter request therefor, dated February 2nd, 1955, the Corps of Engineers indicated that "floating timbers could be installed along the channel face of both the east and west piers" and that "a fender composed of three (3) timbers lashed with cable and anchored to the piers in floating position should provide the desired protection." A floating timber fender system on the east pier was installed by respondent in the same year.

13. The fender system so installed on the east pier consisted of two forty-eight (48) foot straight timbers, one placed along the channel face and the other placed parallel thereto along the shore or east side of the east pier and extending just beyond the point of the icebreaker. Cross timbers about thirteen (13) feet six (6) inches long were placed along the downstream and upstream ends of the pier, attached at right angles to the forty-eight (48) foot logs. All the logs were fourteen (14) inches by fourteen (14) inches when the fenders were installed. The fender installation was held in position by chains and cables to the pier and floated on the surface of the water. The system was designed by an experienced marine engineer who was thoroughly familiar with the characteristics of the bridge. The plans for this construction were never submitted for approval by an authorized governmental officer or agent.

14. Pursuant to notification from the Lake Carriers Association that vessels still encountered considerable difficulty in passing through the draws of the bridge, the Corps of Engineers, Detroit District, again addressed a communication to respondent, dated November 20th, 1958, advising that "this hazardous condition is due to the necessity for passing through the draw at considerable speed in order to maintain adequate steerageway to compensate for river currents at this location and that the concrete bridge abutments are unprotected." The letter suggests that serious consideration be given by respondent to installation of pile clusters or other protective measures at the bridge abutments. Respondent's current managing officer disclaims knowledge of this letter but it was not established that the letter was returned to the sender undelivered. A copy thereof, obtained from the files of the Corps of Engineers, was introduced in evidence.

15. No additional protection was installed on the east pier and no structural changes were made to the floating timber fender system prior to May 15th, 1960, except for replacement of one of the chains or cables which held it in position. The Corps of Engineers held no hearings and issued no orders for any changes in the fender system on the east pier prior to May 15th, 1960.

16. On April 14, 1960, a month and a day prior to the GOBEILLE'S contact with the east pier, the fender system on that pier was damaged by the Steamer IRVIN L. CLYMER, causing damage to the bridge but no damage was sustained by the vessel on this occasion. The damage consisted principally of fracture at the northwest corner of this pier of the forty-eight (48) foot timber fender floating along the channel or west face of the pier. The upstream portion of the timber above the fracture, measuring about ten (10) feet, was set over at an angle of at least fifteen (15) degrees away from the channel. The parallel timber along the east side of the east pier was also fractured at the upstream corner and was similarly set over at an angle toward the shore. One of the chains or cables holding the timber to the west face of the east pier was broken. An examination of the pier above and below the waterline, following this incident but before May 15th, 1960, revealed some minor damage to the underwater portion at or near the northwest corner of the east pier but it was not

established whether this damage occurred as a result of the CLYMER'S contact with the pier or as a result of previous contacts by other vessels. Two (2) heavy boltheads were sheared off the angle approximately fifteen (15) feet down from the top of the corner and heavy steel plating was torn along a vertical distance of about nine (9) inches commencing at a point about five (5) feet above the bottom of the river. The plating was curled and folded back against the concrete pier. The examination of the pier was made on April 27th, 1960 by a marine surveyor and a diver on behalf of interpleaded respondent herein whose Tug SUPERIOR had a bow towline from the CLYMER at the time of its contact with the pier. Respondent Bridge Company's president was informed of this damage by telephone on the same day and was also advised at that time that better fenders were required to hold vessels off the pier.

17. The CLYMER has approximately the same beam as the GOBEILLE but is five hundred thirty (530) feet long, is powered by a thirty-five hundred (3500) horsepower engine, and was loaded to a draft of twenty (20) feet. Its port side forward contacted the bridge between hatches One and Three (of a total of twenty-seven (27) hatches.) The steamer was approaching the east draw and was heading on a water tank of the McLouth Steel plant. The master of the steamer claims his vessel was set over bodily into the fender system by a west-east current while anticipating the usual east-west current in the vicinity of the bridge.

18. The bridge-tender recorded the damage to the fender in a log kept by bridge employees and notified respondent's president thereof.

19. No notices to mariners were issued upon this matter and libelant was not informed of the damage to the fender system on the east pier by respondent or anyone acting in its behalf.

20. The damage to the fender was repaired prior to May 15th, 1960, but only to the extent of repairing the broken chain or cable which held the timber to the pier. The fractured logs were not replaced, as the president of the Bridge Company, who examined the damage shortly after the CLYMER incident, did not think anything was necessary. His main concern was that the long piece within the draw be intact (R. 807), which is consistent with respondent's contention that it was under an obligation to provide or maintain a protective fender system only along the flat surface of the west side of the pier, excluding the corner, under the request of February 2nd, 1955 by the Corps of Engineers for fender protection along the "channel face" of the pier. Libelant interprets the request as including within the "channel face" the northwest corner to protect vessels from the four (4) foot outreach below the water line. This Court finds that before May 15th, 1960 respondent did not contemplate repairs other than replacing the broken cable and re-attaching to the pier timber held to the pier by the cable before it broke.

21. On the return upstream trip of the Tug SUPERIOR on April 14, 1960, the master of the tug observed the damage to the fender system.

22. Entries in the bridge log, with reference to the east pier, show that besides the CLYMER mishap the Ore-boat FRONTENAC hit the pier on December 9th, 1959, and that floating equipment of a dredging company rammed it with a pipe tow on April 20th, 1960.

23. Due to the angle of the northwest corner of the east pier and its steel reinforcement below the water line, it presented a hard and sharp abutment which projected below the water, but the floating fender system in its undamaged condition protected vessels from contact with it by means of the extensions of the fender's structure upstream from portions of the pier which were visible. The bending toward shore of the upstream end of the fractured log, after damage by the CLYMER rendered ineffectual at the northwest corner of the east pier the fender system as originally installed and presented a hazard, in fact,

to navigators attempting to negotiate the draw with downbound vessels. This condition existed on May 15th, 1960 when the GOBEILLE came into contact with the northwest corner of the pier.

24. The master of the GOBEILLE made between forty (40) and fifty (50) trips to and from the McLouth Steel dock, which included a few trips after April 14th, 1960 and prior to May 15th, 1960, but he had no actual knowledge of the damage to the fender system prior to May 15th, 1960. The damage was observed during that time, however, by some members of his crew.

25. On May 15th, 1960, at about 5:55 P.M. E.S.T., the GOBEILLE, was proceeding in the channel at a draft of twenty (20) feet ten (10) inches forward, twenty (20) feet eleven (11) inches amidship and twenty-one (21) feet aft, downward bound for the McLouth Steel unloading dock, with a cargo of ten thousand eight hundred seventy-two (10,872) tons of pelletized ore. Her master arranged with impleaded respondent Towing Company for assistance of two (2) tugs and the tugs SUPERIOR and MARYLAND were dispatched to meet the vessel as she was proceeding toward the bridge. The master of the SUPERIOR on this occasion also piloted the SUPERIOR on April 14th, 1960 when the CLYMER, with a towline to the tug, rubbed the east pier of the bridge. The SUPERIOR was piloted by the master who was in charge of the tug on April 14th, 1960, when the CLYMER, with a bow towline to the SUPERIOR, came into contact with the bridge.

26. Libelant employed impleaded respondent's tugs on previous trips through the channel, and on this occasion, for assistance from a bow tug through the bridge and in making the left turn, and from a stern tug to hold the vessel in an emergency such as failure of the bridge to open for some reason. Both tugs were used for assistance in winding or turning the steamer in the turning basin at the McLouth Steel dock. The master of the GOBEILLE considered a stern tug more of a handicap than an aid in negotiating the draw since it could interfere with control of a self-propelled vessel's stern by means of the vessel's engine and rudder inside the bridge draw where the area for maneuverability was limited. On May 15th, 1960 the SUPERIOR and the MARYLAND performed functions of the bow and stern tug, respectively.

27. The GOBEILLE reduced its speed to slow speed ahead to meet the tugs at Hennepin Point, about two and ⅜ths (2⅜ths) miles above the bridge and maintained that speed until it reached the east draw of the bridge; the SUPERIOR took her bow towline when it was abreast of Buoy 28, located about a mile above the bridge, leaving a distance of forty (40) or fifty (50) feet between the stem of the vessel and stern of the tug, just keeping a strain on the line to keep the slack out of it. The MARYLAND trailed the flotilla without a stern towline from the vessel.

28. The crew of the GOBEILLE on May 15th consisted of the first-mate and wheelsman, stationed with the master in the pilot house, a second-mate as stern-lookout on the main deck to watch for clearances, and a watchman as a bow-lookout on the forecastle deck. The master maintained a position in the front window of the pilot house which was open at all times and through which he could readily communicate with the watchman on the forecastle deck.

29. Throughout the course of her approach to, entry into and passage through the draw the GOBEILLE furnished her own headway, set her own course and speed, worked her engines and used her helm without any signals from or to the tugs at any time and gave no instructions to the tugs in advance of meeting the tugs in the channel.

30. The weather at this point was clear, there was a moderate wind of twenty-five (25) to thirty (30) miles per hour westward (there was conflict whether it was from the northwest or southwest), and the current was estimated to be from three (3) to four (4) miles per hour with cross currents set-

ting from east to west, commencing at Buoy 28. These current conditions were normal for that area.

31. Large vessels, including the GOBEILLE customarily used the east draw as the easier draw to negotiate because of the physical characteristics of the bridge and channel, and the lesser degree of left turn after entering the draw. Most of such vessels also favored the east side of the east draw to allow for the anticipated east-west current within the draw and prevent contact with the center pier, and the GOBEILLE followed this course on May 15th.

32. The bridge opened promptly on signal.

33. The GOBEILLE headed on a water tank at the McLouth Steel plant, her customary landmark, when it was two (2) or three (3) ship-lengths upstream of the bridge. The master expected this heading to take her clear of the east pier by about twelve (12) feet.

34. When the vessel's stem was approximately abreast of the upper crib of the center structure the master of the Tug SUPERIOR believed she might be somewhat close to the east abutment of the draw and pulled her bow on the towline to starboard at about forty-degree (40°) angle; he then proceeded across the GOBEILLE'S bow to be in the usual position at her port side to assist her in making the left turn.

35. As the GOBEILLE'S stem approached the draw her master noticed that she was setting somewhat to the left (R.25). He ordered the wheelsman to put her "hard right" and she just began to respond but he decided he made a "bull" because he might get into difficulties with the center pier and might not be able to recover, so he ordered "steady" and "nothing to the left" (of the water tank on which he wanted to continue heading). There was no change in speed.

36. The vessel entered the east draw at an angle of about fifteen degrees (15°) to the west of the draw side, or west side, of the east pier. As it passed through the draw it was suddenly but slowly set bodily to port toward the east pier. At that time and even as its pilothouse (thirty (30) to forty (40) feet aft of the stem) was abreast of the pier, the master continued to rely on the anticipated east-west current to keep her off the pier but she sagged toward and rubbed the pier below the waterline although no contact was made above water.

37. The contact caused a slight sheer and to prevent further sheering a "hard left" rudder was ordered and speed increased to half-ahead, the vessel was again under control, speed was reduced again to slow-ahead, and the draw and left turn were negotiated without further difficulty. The captain of the Tug SUPERIOR did not know she rubbed the pier until he was so informed when the flotilla reached the McLouth dock. There was no additional damage or at most insignificant damage to the bridge but the GOBEILLE sustained extensive damage as a result of rubbing against the hard sharp northwest corner of the pier.

38. The master of the GOBEILLE could not account for the set but believed it was an unexpected west-east current although he admitted that the wind could have a slight effect, also that suction will occur when a loaded deep-draft vessel approaches too close to a stationary object and that suction may have had something to do with the set in this instance. His deep-draft vessel's proximity to the bridge, a stationary object, caused suction which could be responsible for the set. The master of the Tug SUPERIOR did not notice any west-east current. Except for the CLYMER captain's claim that such a current set his vessel against the pier on April 14, 1960, other experienced navigators regularly using the east draw never encountered a west-east current in this area. After considering the testimony of all witnesses on this issue it is not difficult to conclude that the master of the GOBEILLE was mistaken as to a west-east current and that the GOBEILLE, with its heavy cargo of ore, was drawn against the pier by suction and that the wind westward may have contributed somewhat to the set.

39. Considerable testimony was offered, some of it conflicting, as to the distance of the GOBEILLE from marks in the channel and from the middle of the channel in approaching the east draw and from the piers of the bridge; there was also testimony of navigators regularly using the east draw as to their course in approaching, entering, and passing through the draw. The captain of the GOBEILLE testified that he would not want to be closer than twelve (12) feet from the east pier yet the testimony establishes that he was half that distance or less from the pier and was relying solely on the current from the east to carry the ship off the pier and did nothing to extricate the ship from its perilous position. He testified at one point that "the closer you are in (toward the east pier) without doing damage" the better chance you have of swinging the wheel for the left turn. It is apparent from the evidence that the GOBEILLE not only favored the east side of the east draw but that it hugged the east pier and that its course in approaching and entering the draw on this occasion did not allow for sufficient and safe distance away from the east pier. That the master could safely allow for more distance is indicated by his testimony to the effect that had he known of the damage to the bridge he would have been further away from the pier.

Even allowing for the east-west current, which it has been established does not set a vessel to the west more than twenty (20) to thirty (30) feet toward the center pier, the beam of the vessel and width of the draw allowed for much closer proximity to the middle of the draw and the GOBEILLE'S master courted calamity by taking his vessel with its heavy cargo so close to the pier that it could be set by suction against the pier. It was faulty seamanship on his part to do so.

40. As the vessel was closing in on the pier and collision with the bridge was imminent the master of the GOBEILLE could have used her rudder and increased her speed to move away from the pier, as he did successfully to prevent a pronounced sheer after she rubbed the pier and bounced off of it slightly.

It is obvious that his apprehension of difficulties with the center pier, at that proximity to the east pier, was not warranted, particularly since the Tug SUPERIOR was by that time in a position to help her from going too much starboard. This was also faulty seamanship.

41. Libelant contends that, as in the case of the CLYMER, the GOBEILLE would not have sustained any damage had the fender system at the east pier been repaired after its damage by the CLYMER. It further contends that both accidents occurred under identical circumstances.

Although some variance was shown in the courses followed by the two vessels before they made contact with the pier, which may have had some effect on the degree of impact, there is no doubt that the damage to the GOBEILLE would have been minimal, if not completely avoided, if the northwest corner of the pier had been protected by the fender system in the condition in which it was prior to damage of the timbers by the CLYMER on April 14th, 1960.

42. It is obvious that the Tug MARYLAND in no way participated, nor was it intended by the captain of the GOBEILLE that she participate, in maneuvering the GOBEILLE through the draw. The actual navigator of the flotilla through the channel and draw was the captain of the steamer, under the facts of this case, and the function of the Tug SUPERIOR was limited to a pull on the bow, if the steamer swayed from her course, to help the navigator of the steamer to bring her back on course. This was done by the tug when she pulled the steamer to starboard, at which time the tug had a right to rely on the steamer to use her own motive power primarily to keep from going to port. But the steamer did little or nothing in this respect and her master relied, instead, solely on an east-west current to move her starboard, and there was no call to the tug for additional assistance. In fact, no one aboard the GO-

BEILLE appeared to pay much attention to the tug or her position in relation to the vessel and the GOBEILLE'S master was not even aware of the pull to starboard by the tug.

■ 43. The damage to the GOBEILLE was examined at the McLouth Steel dock by the crew of the vessel. Libelant was informed thereof and arranged for a survey of the damage at the dock which resulted in a determination that there was sufficient leakage to affect seaworthiness of the vessel and that it should be put in drydock immediately for repairs. This was done the following day. It was routine practice to notify the interpleaded respondent of the damage, by reason of a time limit for such notice provided for in the TOWING COMPANY's Tariff. Also notified and participating in the survey were the U. S. Salvage Association, the U. S. Coast Guard, and the American Bureau of Shipping, and libelant's attorneys were requested to make an investigation of the causes of the accident. The attorneys also were requested by libelant to attend and did attend Coast Guard hearings held to determine the cause of the accident. No notice was given to respondent because there was no actual knowledge on the part of libelant as to the CLYMER incident or that there might be fault on the part of respondent, until after the investigation was completed a few months later. Unfortunately, by that time all repairs to the vessel had been completed and no opportunity was afforded to respondent to make a survey of the claimed damage. This court finds that failure to notify respondent of the damage in time to give it an opportunity to participate in the survey was not, as contended by respondent, deliberate, but was due to inadvertence.

■ 44. The port side forward of amidships of the GOBEILLE was damaged below the waterline. Shells were set in and frames were bent in an area approximately twelve (12) feet in length; and rivets were damaged enough to cause some leakage at the seams. Localized wear-and-tear damage was present but it had not affected seaworthiness. Routine soundings of the vessel every four (4) hours prior to the time of the accident would have indicated leakage if there had been any and none of the surveyors participating in the survey found any prior damage in the affected area of the hull other than the localized damage. From all of the exhibits, as well as from the testimony of numerous witnesses offered in evidence the Court is satisfied that the damage repaired while the vessel was in drydock, for which claim is made in suit, were actually sustained by the GOBEILLE as a result of her rubbing the northwest corner of the east pier of the bridge below the waterline on May 15th, 1960. Adverse interests were represented at the survey to protect against any unjustified claims of damage.

■ 45. It has been established and the Court finds that the damage to the pier could have been repaired prior to May 15th, 1960, and the fender system restored to its condition before it was damaged by the CLYMER.

■ 46. In view of the Court's finding that respondent did not, in any event, contemplate restoring the fender system to its original condition by replacing the fractured timbers, prior to the GOBEILLE incident on May 15th, 1960, it is not necessary to determine whether the delay in making repairs was unreasonable. Nevertheless the Court finds under the facts and circumstances as developed by the evidence even if repairs had been contemplated to restore the fender system to the condition in which it was prior to the CLYMER incident, a delay of a month and a day was unreasonable.

47. Respondent had knowledge of the hazards to which passing vessels were exposed as a result of the unprotected northwest corner of the pier. As this Court found, libelant had no actual knowledge of the damage to the pier. Crew members of the GOBEILLE admitted that they were aware there was a taper to the pier and that they had no reason to believe that the taper to the pier did not continue into the water, but did not know of the extent of the outreach of the

pier below water. Since the base of the pier extended only a short distance above water and view of this portion was partially obstructed by the floating fender system, it was difficult to see the degree of taper from a passing vessel. After damage to the bridge by the CLYMER and repairs to the extent only of re-attaching the timbers on the west side of the pier to the pier by replacing the broken cable, navigators had reason to believe that the fender system still afforded adequate protection underwater at the northwest corner of the east pier.

## DISCUSSION

Construction and maintenance of bridges over navigable waters is controlled by Secs. 491 et seq., Title 33 U.S.C. The Grosse Ile Bridge was constructed in compliance with Sec. 491 which requires submission of plans and drawings for approval by the Secretary of the Army and Chief of Engineers, construction in compliance with the plans, and a similar approval of any deviations after completion of the structure, making deviation without such approval unlawful.

Section 494 of the same Title provides in substance that a bridge erected pursuant to Secs. 491–498 should not at any time unreasonably obstruct the free navigation of the waters over which it is constructed and imposes a duty upon the Secretary of the Army to order changes in construction or even removal of the bridge if in his opinion such bridge does unreasonably obstruct navigation. In such event, however, the statute requires notice to interested parties and reasonable opportunity to be heard, formal notification to the owner to alter with specification of the changes to be made, and reasonable time within which to make the changes. (See Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523, interpreting the predecessor statute under which the Grosse Ile bridge was constructed).

Plans for the construction of the floating fender system which respondent erected in 1955 were not submitted for approval either before construction or at any time thereafter, and the type of construction recommended in the 1955 letter to respondent from the Corps of Engineers does not offer details of construction. Libelant's interpretation differs from that of respondent as to type of protection the letter recommends.

Action was initiated in 1955 by the Corps of Engineers for fender protection at the bridge primarily to safeguard passing vessels from damage, upon insistence for such protection on the part of owners of vessels traversing that area, and it may be assumed that more formal proceedings would follow had not respondent agreed without such proceedings to provide, and provided pier protection. Any deviation therefrom would require, in the opinion of the Court, approval as required by the statute. It is immaterial, therefore, whether one type or another type of fender protection was intended; it is the type of fender system actually in existence, and on which navigators relied during the five (5) years of its existence from the time of its construction and until the date of the GOBEILLE collision, that is determinative of the issue.

Respondent was, therefore, under obligation to maintain the type of fender protection that it erected in 1955, unless approval was secured to deviate therefrom, and it has not been shown that such approval was obtained.

The Court permitted admission into evidence subject to a later ruling on libelant's motion to strike such evidence, of exhibits and testimony on behalf of respondent pertaining to a new fender system installed by it after the GOBEILLE incident, primarily to show that the new fender system does not protect the northwest corner of the pier (which libelant disputes) and that the Corps of Engineers never intended that the fender system constructed in 1955 should protect vessels from the outreach at the northwest corner. Such evidence, in the considered opinion of the Court, is immaterial to the issue involved and libelant's motion to strike will be granted.

884

■ As to libelant's claim that respondent was obligated to supply additional protection at the piers, in view of the letter from the Corps of Engineers of 1960 and the known hazards of passing through the east draw, particularly as evidenced by contacts with the bridge by other vessels, action for additional protection at the pier recommended by the Corps of Engineers never culminated in statutory proceedings and imposed no requirement upon respondent for such additional protection up to May 15th, 1960.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter in this cause.

2. The collision of the GOBEILLE with the east pier of the east draw of the Grosse Ile Toll Bridge was the result of faulty seamanship of the GOBEILLE and to the negligence of the respondent.

3. The Steamer GOBEILLE was negligent in the respects set forth in the findings of fact, and such negligence was a proximate cause of the collision and damage resulting therefrom.

■ 4. The respondent, Grosse Ile Bridge Company, was negligent by reason of its failure to maintain in good condition and to promptly repair the floating fender system at the east pier of the east draw of the bridge and by reason of its failure to give warning to navigators of the damaged condition of the pier. Such negligence of the respondent was a proximate cause of the damages sustained by libelant.

■ 5. There was no fault in the navigation or operation of the Tugs SUPERIOR and MARYLAND, contributing to the collision. Without a showing of any negligence on the part of impleaded (respondents) the claim of respondent against impleaded respondent as set forth in the pleadings, and claims of libelant asserted at the conclusion of the trial, have not been established and the motion of impleaded respondents to dismiss the libel and impleading petition of respondent will be granted.

6. Objections of libelant to evidence introduced by respondent as to changes in the fender system after May 15th, 1960 are well taken and the motion to strike such evidence from the record will be granted.

■ 7. Under the well-established rule of divided damages in collision cases in admiralty, where two parties are at fault in causing a collision and resulting damages, libelant and respondent must bear equally the damages caused in this collision.

Libelant was granted leave to submit proofs as to the actual amount of its damage sustained, after decision of the question of liability. A judgment will be entered after hearing thereon and determination of the amount in which judgment should be entered.

ORDER

I. Impleaded respondents' motion to dismiss the libel and impleading petition as to them is hereby granted and the action is so dismissed.

II. Libelant's motion to strike from the record all evidence regarding the type of fender installed after the casualty is granted and the evidence is stricken from the record.

III. Counsel for the remaining parties are directed to appear before the Court on April 20th, 1964 at 3:30 P.M. for a pre-trial on the issue of damages and for scheduling a date for hearing proofs as to the amount of damage.

ON MOTION TO REFORM FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this admiralty suit by the operator of a vessel, to recover damages allegedly caused by the vessel's striking a bridge owned and operated by respondent, the owner of two tugs was impleaded as a defendant. The tugs were engaged by the master of the vessel to perform certain functions in connection with the vessel's passage through the draw of the bridge.

Upon agreement of proctors for all parties the issue of liability was tried

first and the question of damages was to be left for later determination. Prior to trial and during the course of the trial libelant indicated that it would be difficult to completely separate the issues of liability and damage under the circumstances present in this case. Respondent, as a matter of defense to the libel, claims that there was no contact between the vessel and the bridge or, if there was contact, the damage was minimal. It contends that extensive old damage on the vessel was repaired and that such damages are included in this suit.

It was estimated by proctors that trial of the liability issue would take about three (3) days. Nine (9) days were required for such trial and a substantial portion of this time was devoted to testimony and cross-examination of witnesses on behalf of libelant and respondent, relating to physical damage to the vessel. Witnesses were interrogated as to whether the damage repaired and for which claim is made could have resulted from the impact. The taper of the pier, tumblehome of the vessel, depth of the water, the angle at which the vessel was proceeding, and all other conditions then existing were considered during an intensive examination of such witnesses. Reports of four surveyors, who examined the vessel in drydock, were introduced in evidence.

No proof was submitted as to dollar cost of repairs, incidental expenses, and claim for loss of use of the vessel while in drydock, except for some mention by the surveyors of the cost of repairs.

Findings of Fact, Conclusions of Law, and an Order thereon were filed by the Court. The Court found that the collision resulted from faulty seamanship of the vessel and from negligence of the respondent in the maintenance and operation of the bridge and that both must bear equally the damages sustained. It also found that the damage repaired while the vessel was in drydock, for which claim is made in suit, was actually sustained as a result of the ship's contact with the pier of the bridge. In the Findings and Conclusions the Court stated that a judgment would be entered after determination of the amount of damages upon the second phase of the trial. It was also found by the Court that there was no fault on the part of the impleaded respondent and that its motion to dismiss the libel would be granted.

The Order entered on the basis of the Findings and Conclusions granted the impleaded respondent's motion to dismiss and dismissed the libel as to it. It also directed proctors to appear for further proceedings on the issue of damages.

Respondent filed an appeal from all appealable issues within fifteen (15) days after filing of the Findings of Fact, Conclusions of Law, and Order thereon. Thereafter it filed a motion to reform the Findings of Fact and Conclusions of Law so as to exclude any reference to the physical damage caused to the vessel in the collision, contending that the question of damages was not to be determined until the second phase of the trial, on the issue of damages, was had. Libelant opposes the motion and contends that the issue of physical damage to the vessel sustained in the collision was fully developed during the first portion of the trial, that such issue should not be relitigated.

It contends that only the dollar cost of repairs, incidental expenses, and the claim for loss of use of the vessel were to be determined later. This also appears to be the understanding of impleaded respondent.

The Motion to reform was argued, briefs were also submitted, and the motion is now before the Court for determination.

In its brief respondent admits that a review of the testimony does reveal that the question of damage to the vessel has been satisfactorily explored. It states that it does not intend to produce any additional witnesses on such issue but that it desires an opportunity to further cross-examine two of the surveyors who already testified and were previously cross-examined by respondent. In the brief re-

spondent also discusses at length much of the testimony introduced at the first phase of the trial, such as the taper of the pier, the depth of the water, tumble-home of the vessel and other details of conditions existing at the time of the incident involved. Respondent contends that the damage actually repaired included old damage and that only a small specified area of deepest indent could have been caused by the impact under the circumstances then existing. Respondent requests that this Court set a hearing date for testimony of the two surveyors whom respondent desires to cross-examine, "if the Court is not satisfied that the present proofs are conclusive that the area repaired included extensive old damage and that the damage sustained in this accident, if any, was the elliptical area on plate H6". In effect, respondent asks the Court to review and reconsider the evidence previously submitted and to revise its previous ruling as to the area of the vessel damaged as a result of its impact with the bridge.

Respondent admits that its cross-examination of the two surveyors it wants to cross-examine further was in no manner limited at the first trial.

Impleaded respondent is also of the view that the issues of liability and physical damage to the vessel are so interrelated that it is difficult to separate them, that the Findings of Fact and Conclusions of Law form an integral part of the decision of no-liability as to impleaded respondent, which is now before the appellate court for review, and that there is serious doubt that the Court has authority to reform the Findings and Conclusions at this time.

While admiralty suits are governed by separate Admiralty Rules, statutes which apply to civil actions generally apply to appeals in admiralty. Cyc.Fed. Proc. Vol. 13, Sec. 60.119, p. 491. Appeals in admiralty must be filed within ninety (90) days after entry of the order, judgment or decree appealed from, if it is a final decision, and within fifteen (15) days after its entry if it is an interlocutory decree. 28 U.S.C. § 2107. Appeals from interlocutory decrees may be filed if such decrees determine the rights and liabilities of the parties. 28 U.S.C. § 1292.

No citations of authorities are deemed necessary for the proposition that upon appeal from a final judgment or order of a district court to the appropriate appellate court, in actions governed by Federal Rules of Civil Procedure, the district court loses jurisdiction as to issues appealed from except to do such things as are necessary to aid in the appeal (transmitting the record, correcting typographical errors, etc.). That an appeal in admiralty cases has a similar effect can be inferred from opinions of the court in The Charles D. Leffler, 3 Cir., 100 F.2d 759 and Hadjipateras v. Pacifica, S.A., 5 Cir., 290 F.2d 697.

Respondent's appeal is from all appealable portions of this Court's Order filed simultaneously with the Findings of Fact and Conclusions of Law. The only appealable portions, it claims, are those which relate to granting of impleaded respondent's motion to dismiss and dismissal of the libel as to it. Proctor for respondent refers to it as a final order and the Court finds support for such contention in Moore v. United States, 112 U.S.App.D.C. 333, 302 F.2d 918. It was held in that case that the finality of a consequence of an order determines whether it is interlocutory or final, insofar as timeliness of the appeal is concerned (p. 920). As to the meaning of the term "rights and liabilities" see Emerick v. Lambert (6A 6), 187 F.2d 786 in which the Court holds that this phrase means the merits of the controversies between the parties.

The merits of the issue of liability were determined both as to respondent and impleaded respondent in the Findings of Fact and Conclusions of the Law. The Order entered thereon finally disposes of all issues as to impleaded respondent. No reference is made in the order as to liability of libelant or respondent for damages, but both of these parties are directed therein to proceed with the issue of damages.

In addition to the finding of liability on the part of libelant and respondent, contained in the Findings of Fact and Conclusions of Law, had a decree or judgment been entered, as to such liability, there could be no question as to its nature. Under 28 U.S.C. § 1292 an appeal would clearly lie from the finding of liability on the part of respondent. In a case decided under 28 U.S.C. § 227, predecessor to 28 U.S.C. § 1292, the primary purpose of the statute allowing review of an order determining rights and liabilities of parties in admiralty suits is stated. Such purpose is to avoid the expense and delay of a reference to compute damages, since it is always possible that the libelant may later turn out to have no right to recover at all. The Maria, 2 Cir., 67 F.2d 571. See also H. Lissner & Co., Inc., v. Oceanic Steam Nav. Co., Limited, 2 Cir., 30 F.2d 290, in which the Court stated that the correctness of an order may be tested, if it determines rights and liabilities of the parties, "leaving only the question of damages for determination."

If an appeal had been contemplated only from the final order dismissing the libel as to impleaded respondent, respondent had ninety (90) days within which to file it. It filed the appeal within the fifteen-day (15-day) period allowed for appeals from interlocutory decrees, and thus protected itself as to any "appealable portions" of the order, whether it is final or interlocutory. Specific grounds for appeal are not available to the Court at this time. It may be that the appellate court may entertain matters other than the final order of dismissal of the libel as to impleaded respondent, if advanced by respondent for consideration on appeal.

This Court is in accord with the views of libelant and impleaded respondent that the issues of liability and physical damage to the vessel are closely related and that a finding on one of the issues has a bearing on the other. Particularly as to points raised by respondent on the motion, such Findings and Conclusions must be left undisturbed. A review of such issues on appeal could, under the circumstances of this particular case, have a bearing on this Court's finding as to liability or non-liability of parties to this action, including the impleaded respondent.

For reasons herein stated, the motion to reform Findings of Fact and Conclusions of Law is denied.

An appropriate order may be presented for signature and entry.