**SECURITIES AND EXCHANGE COM-MISSION, Plaintiff,**

v.

**CROFTERS, INC., et al., Defendants.**

**Civ. A. No. 70–351.**

United States District Court, S. D. Ohio, E. D.

Aug. 10, 1972.

---

John I. Mayer, William D. Goldsberry, William M. Hegan, and Donald Dreyfus, Securities & Exchange Commission, Chicago, Ill., for plaintiff.

John J. Chester, Lawrence D. Stanley, James S. Monahan, Jack R. Alton, George E. Tyack, Bradley Hummel, John D. Holschuh, Alvin J. McKenna, Alphonse P. Cincione, Columbus, Ohio, for defendants.

## OPINION AND ORDER

CARL B. RUBIN, District Judge.

This matter comes before the Court on the motion for a preliminary injunction as against all defendants filed by plaintiff Securities and Exchange Commission (S.E.C.); the motions for summary judgment filed by defendants

Crofters, Inc., Deegee Company, Regency Acceptance Corporation, Donahue, Griffith, Groban, Consolidated Oil & Gas, Inc., Trueblood, Kerr, Clark, Coffey and King Resources Company; and cross motions for summary judgment by S.E.C. against Consolidated, Trueblood, Kerr and Clark.[1] Voluminous briefs and depositions have been submitted to and carefully considered by the Court. For the purposes of this Order the details of this matter, as colligated by the Court at this point of the proceedings, are as set forth below.

### I

#### Dramatis Personae

Defendant Crofters, Inc., is a corporation organized and incorporated under the laws of Ohio and has its principal place of business in Columbus, Ohio. Its principal shareholders and officers are defendants Donahue, Griffith and Groban all of whom reside in the Southern District of Ohio. Defendant Deegee Company (hereinafter Deegee) is a partnership composed of these same three individuals and Regency Acceptance Company (hereinafter Regency Acceptance) is a sole proprietorship owned by defendant Groban. Both Deegee and Regency Acceptance have their principal place of business in Columbus, Ohio.

Defendant Consolidated Oil & Gas, Inc., (hereinafter Consolidated) is a corporation organized and incorporated under the laws of the State of Colorado, and has its principal place of business in Denver. Its principal business functions are the exploration and sale of oil and gas and the development and drilling of

1. King Resources' motion for summary judgment rests on grounds which are disparate from those raised by the other moving defendants and will therefore be treated separately below. The plaintiff's motion for default judgment against defendant Howard was rendered insubstantial by his answer of July 20, 1972 and the plaintiff has expressed to the Court its intention to withdraw said motion. It will therefore not be considered. Defendants Colorado Corporation, LCM Corporation, Regency Income Corporation, King and Lore have not filed any motions before the Court. They are involved in the present matter only to the extent that the S.E.C.'s motion for preliminary injunction seeks injunctive relief as to them as well. The issues raised in Clark's motion to dismiss dated December 10, 1970 are reiterated in a more complete fashion in his instant motion for summary judgment. Pursuant to Rule 12(b), Fed.R.Civ.P. the Court will deem the former motion merged into the latter and will treat them collectively.

oil and gas wells. Defendant Trueblood is chairman of Consolidated's board of directors.

Defendant King Resources Company (hereinafter King Resources) is a corporation organized and incorporated under the laws of the State of Maine, having its principal place of business in Denver, Colorado. During material times herein and at least until August, 1970, defendant John King was chairman of King Resources' board of directors and defendant Coffey was its executive vice-president. This company is now in reorganization proceedings under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. before the United States District Court for the District of Colorado. Defendant Colorado Corporation is a Colorado concern with its principal place of business in Denver, Colorado. It has been controlled by defendant King and his immediate family. Defendant Regency Income Corporation, (hereinafter Regency Income) a Colorado corporation having its principal place of business in Denver, Colorado, is a wholly owned subsidiary of Regency Management Corporation which, in turn, is a wholly owned subsidiary of defendant Colorado Corporation. Defendant Kerr was the president of both Regency Income Corporation and Regency Management Corporation during times material herein.[2]

Defendant Four Seasons Nursing Centers of America, Inc., (hereinafter Four Seasons) is a Delaware corporation having its principal place of business in Oklahoma City, Oklahoma. Its principal business function is the development and operation of health care centers. Four Seasons is currently in reorganization proceedings under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq., before the United States District Court for the Western District of Oklahoma. Defendant Clark was the president of Four Seasons during times material to the complaint in this suit.

Defendant LCM Corporation is an Ohio corporation with its principal place of business in Columbus, Ohio. Defendant Lore is chairman of LCM's board of directors and was, until January 1970, investment officer and investment consultant to the School Employees Retirement System of Ohio (hereinafter SERS). Defendant Howard is an independent moneyfinder and works out of Los Angeles, California. By terms of a consent decree Howard and his company, R. R. Howard & Company, Inc., have been prohibited from registering as broker-dealers under Section 15(b) of the Securities and Exchange Act of 1934. See Securities Exchange Act Release No. 8009, December 20, 1966.

The plaintiff Commission is a federal regulatory agency charged with the enforcement of federal securities law. It has brought this action under Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b) and Section 21(e) of the Exchange Act of 1934, 15 U.S.C. § 78u(e).[3] The jurisdiction of this Court is properly invoked pursuant to Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a) and Section 27 of the 1934 Act, 15 U.S.C. § 78aa. SEC seeks to enjoin pursuant to its five count complaint, allegedly fraudulent and deceptive prac-

---

2. Regency Management Corporation is not a defendant in the instant action. Defendant Kerr is therefore before the Court only in his capacity as president of Regency Income.

3. These statutory provisions are nearly identical and both confer broad equitable powers upon this Court. Section 21(e) of the 1934 Act, for example, provides in material part as follows:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or prac-

tices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation thereunder, it may in its discretion bring an action in the proper district court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. 15 U.S.C. § 78u(e).

tices committed by the nineteen corporate and individual defendants.

## II

### The Complaint

Count I of the complaint, directed against all of the defendants except LCM Corporation and Lore, alleges violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), in the offer and sale of securities, in the form of corporate promissory notes.[4] Specifically these defendants are charged with misrepresenting to the purchasers that the notes in question were rated prime by the National Credit Office (hereinafter N.C.O.), a division of Dun & Bradstreet. The purchasers allegedly misled by these misrepresentations include the Treasurer of the State of Ohio and the Industrial Commission of Ohio, acting for the account of Ohio's Disabled Workmen's Relief Fund. (Complaint, Paragraph 25). The plaintiff Commission further alleges in Count I that these same defendants omitted to state material facts in the course of the various note transactions which, in light of other statements made, rendered such omissions misleading. See Section 17(a)(2), Securities Act of 1933. The alleged omissions include, but are not limited to, the following: (1) Substantial portions of the monies obtained through the sale of the promissory notes in question were reloaned to various individuals and corporations; although the reloaning was agreed to before the notes were sold, this information was not brought to the purchaser's attention; (2) King Resources Company, at the time it sold the notes in question, was not meeting its current obligations to creditors as they matured; and (3) Four Seasons' income and sales for the six month period ending December 31, 1969, and for the first quarter (January, February and March) of 1970 were substantially overstated. (Complaint, Paragraph 26). Count II of the Complaint incorporates these same factual allegations within the legal context of Section 10(b), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated thereunder, of the Exchange Act of 1934.[5]

---

4. Section 17(a) of the 1933 Act provides as follows:

> (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
> 15 U.S.C. § 77q(a).

Corporate and personal promissory notes are, of course, included within the definition of "securities" within the meaning of both the 1933 and 1934 Acts. See Section 2(1), Securities Act of 1933, 15 U.S.C. § 77b(1); Section 3(10), Exchange Act of 1934, 15 U.S.C. § 78c (10); also see Tcherepnin v. Knight, 398 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Farrell v. United States, 321 F.2d 409 (C.A.9, 1963), cert. den. 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478 (1968); Anderson v. Francis I du-Pont & Co., 291 F.Supp. 705 (D.Minn., 1968); Whitlow and Associates Limited v. International Brokers, Inc., 252 F.Supp. 943 (D.Haw., 1966); S.E.C. v. Addison, 194 F.Supp. 709 (N.D.Tex., 1961).

5. Section 10(b) of the Exchange Act of 1934 provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in

Counts III and IV of the Complaint are directed against LCM Corporation, Lore and the Crofters defendants.[6] Count III charges these defendants with violating Section 17(a) of the 1933 Act by misrepresenting to purchasers, including SERS, that certain promissory notes which were offered for sale were the notes of local housing agencies, when in fact they were not. (Complaint, Paragraph 29). The Crofters defendants are further charged under this Count with failing to inform the purchaser of these notes of the one-half interest they were to receive from the prospective real estate developments of certain borrowers, in addition to a customary fee. (Complaint, Paragraph 30). Count IV reiterates these factual allegations within the purview of Section 10(b) and Rule 10b–5.

Count V is directed solely against the Crofters defendants and charges them with conducting an interstate business as broker-dealers in securities, without registering with the S.E.C. under Section 15(b) of the 1934 Exchange Act, in violation of Section 15(a) of said Act. 15 U.S.C. § 78o(a) and (b). Plaintiff Commission now seeks an injunction against all defendants to permanently enjoin the aforementioned acts.

### III

### Factual Setting of this Controversy

The factual pattern in this case is elaborate because of the large number of defendants and the numerous transactions in which they were involved. For the limited purpose of this Order, and on the basis of the parties' briefs and the depositions filed herein, the following will be assumed.

### (a)

### General Background to the Loans

In August and September of 1969 defendants Donahue, Griffith and Groban formed defendant Deegee and incorporated defendant Crofters. Donahue, a Columbus attorney (as is Griffith), had been First Assistant Attorney General and Tax Commissioner of Ohio. Groban, prior to his association with Crofters, was involved with numerous enterprises including the financing business. Between the fall of 1969 and the spring of 1970 defendant Crofters helped arrange the sale of $22,000,000 of promissory notes of various corporations to the State of Ohio, through the State Treasurer's Office and Ohio's Workmen's Compensation Fund.

At the time these transactions were consummated both the Treasurer and the Fund were restricted by statute from utilizing the investment funds administered by them in certain types of investments. The Treasurer had legal authority. pursuant to O.R.C. § 135.14, to invest no more than $50,000,000 of "interim funds" in commercial paper rated "prime" by N.C.O., a division of Dun &

the public interest or for the protection of investors.

Rule 10b(5) to the Securities and Exchange Commission, promulgated pursuant to their rule making authority conferred by Section 10(b), above, provides as follows:

Rule 10b–5. Employment of Manipulative and Deceptive Devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

6. As used in this opinion Crofters will refer to and subsume the corporate entity so named, in addition to Deegee Company, Regency Acceptance and the individual defendants, Donahue, Griffith and Groban. We do this because of the substantial identity of the parties. See part I of this Opinion and Order, *supra*, at p. 240–242.

Bradstreet.[7] Commercial paper is commonly and customarily regarded in the securities industry as an unsecured promissory note with a maturity term not exceeding 270 days, the proceeds of which are used for working capital purposes. (See Merker dep., p. 12).[8] Only notes possessing these characteristics are rated by N.C.O. Other mercantile agencies rate non-commercial paper and longer term bonds and debentures. The Workmen's Compensation Fund was restricted by state law to investments in corporate notes certified by one of the standard rating services "to be of investment equivalent to, or higher than, the quality of bonds rated in the third highest investment classification." Workmen's Compensation Law of Ohio, O.R.C. § 4123.44.

### (b)

### The Whittaker-Vector and I.H.C. Loans: Counts I and II

The first note transaction occurred on August 28, 1969. On that date the Treasurer's Office of the State of Ohio purchased a two-year $5,000,000 note of the Whittaker Corporation and its wholly owned subsidiary, The Vector Company, Inc. The parties to this transaction were defendant Donahue and Gardner, who was at that time Deputy Treasurer of the State. Gardner, in testimony before the state's Auditor's Office, has testified that Donahue represented that the note had been rated prime by N.C.O. Merker, however, has testified that neither Whittaker nor Vector had ever sought or obtained a prime rating from N.C.O. (Merker dep., p. 141). There is nothing in the Crofters defendants' brief in support of their motion for summary judgment which explains this particular sale. Vector paid defendant Regency Acceptance Company $75,000 for Donahue's services in connection with the sale. Defendants Donahue and Griffith each received $25,000 of this amount.

On September 26, 1969 Whittaker and Vector sold a two-year $2,000,000 promissory note to the state Treasurer's Office. Again, the arrangements for this sale were made between Donahue and Gardner and, according to Gardner's testimony, the note was represented by Donahue as prime. As noted above, neither of these two companies ever submitted their financial data to N.C.O. for the purpose of being rated for the commercial paper market. Vector paid $25,000 to Regency Acceptance Company for Donahue's services in connection with this sale and each of the Crofters principals received one-third of this amount. See Hegan affidavit dated No-

7. O.R.C. § 135.14 relating to the "Investment of interim moneys" provides, in material part, as follows:

The treasurer or governing board may invest or deposit any part or all of the interim moneys, provided that such investments will mature or are redeemable within two years after the date of purchase. The following classifications of obligations shall be eligible for such investment or deposit:

(A) Bonds, notes, or other obligations of or guaranteed by the United States, or those for which the faith of the United States is pledged for the payment of principal and interest thereon;

(B) Bonds, notes, debentures, or other obligations or securities issued by any federal government agency, or the export-import bank of Washington;

(C) Interim deposits in the eligible institutions applying for interim moneys as provided in section 135.08 of the Revised Code. . . .

(D) Bonds and other obligations of this state.

In addition to the investments specified in subparagraphs (A), (B), (C), and (D) of this section, the treasurer of state may invest interim moneys of the state in commercial paper notes issued by any corporation for profit which is incorporated under the laws of the United States, a state, or the District of Columbia, which such notes are rated prime by the National Credit Office, Inc., New York, or its successor, provided that the aggregate total amount of interim moneys invested in commercial paper at any time shall not exceed fifty million dollars.

8. Merker was at all times material herein, vice-president in charge of N.C.O.'s Commercial Paper Division.

vember 13, 1970, paragraphs 10 and 11, attached to plaintiff's memorandum in support of motion for preliminary injunction.

On October 16, 1969, the state Treasurer's Office purchased a two-year $2,000,000 promissory note of I.H.C. Corporation. Arrangements for this loan were made by Donahue with Deputy Treasurer Gardner. According to Gardner's testimony before the Auditor's Office, Donahue told him the note was rated prime. (Gardner's dep. before the Auditor's Office dated May 20, 1970, p. 11). Merker has testified that I.H.C. never requested a rating from N.C.O. on its commercial paper (Merker dep., p. 141). The Crofters defendants have not countered the allegations pertaining to this transaction in their pleadings before this Court. I.H.C. paid Deegee a $70,000 fee for services rendered in connection with this transaction. See Hegan affidavit, *supra*, paragraph 12.[9]

### (c)

### The Consolidated Loans

The Court takes notice of the following, essentially uncontraverted facts, as they relate to the Consolidated loan transactions. Defendants Trueblood and Kerr had been social and business acquaintances for many years prior to January, 1970. Both were aware of and had conversations relating to the general tightening of the capital markets which began in the late 1960's and continued into the 1970's. (Trueblood dep., pp. 6-12). In the early part of January, 1970, defendant Howard called Kerr and told him that he had located a substantial source of long-term money for his company's needs. (Kerr dep., pp. 11-13). In a subsequent phone call Howard told Kerr that $1,000,000 was immediately available and that additional sums would become available in the future. Howard informed Kerr at this time that the requirements for obtaining these loans included a net corporate assets of $25,000,000 and being listed and traded on one of the two major New York stock exchanges. Regency Income did not satisfy the second of these requirements. (Kerr dep., p. 14).

In the early part of the week of January 19, 1970, Kerr called Trueblood and informed him of the conversations he had had with Howard, and of the requirements for borrowing money from the State of Ohio. During the course of this conversation Kerr asked Trueblood if Consolidated would consider reloaning to Regency Income a portion of the money it might borrow from Ohio. Trueblood told Kerr that he would consider such an arrangement but that it would depend on Consolidated's money needs and that the reloaned money would be subject to immediate recall. (Trueblood dep., pp. 6-8). Trueblood also indicated that Regency Income would be responsible for a part of the fees, if any, incurred in making the loan. At the time of this conversation Kerr knew that Trueblood had been seeking additional sources of capital (Trueblood dep., p. 11).[10] Trueblood then sent copies of certain financial information and other data to Groban in Columbus. (Exhibit 13 to dep. of Groban).

Subsequently, during the week of January 19, 1970, Kerr recontacted Trueblood and told him that $1,000,000 was immediately available for a two-year term at $9\frac{1}{2}\%$ interest. After discussing the matter with Consolidated's Executive Board, Trueblood told Kerr that his company was willing to borrow the money from the State of Ohio and reloan the entire amount to Regency Income. The terms of Regency's note to Consolidated were to be identical to those of Consolidated's note to Ohio.

9. It should be noted at this point that S.E.C. has not made Whittaker, Vector, I.H.C. or Deputy Treasurer Gardner party defendants to the instant injunctive proceedings.

10. Kerr had already agreed to reloan a portion of any monies received by Regency Income from Consolidated to Howard. See Kerr dep., at 30.

Trueblood, however, did insist that Kerr agree to two conditions: (1) Regency Income was to pay all expenses incurred and prepare all the documentation involved in connection with the loan from Ohio; (2) The money reloaned to Regency was to be subject to immediate recall by Consolidated. (Trueblood dep., p. 20). Kerr agreed to these conditions and told Trueblood to expect a call from Groban. (Trueblood dep., p. 24).

On January 23, 1970, Groban called Trueblood who was not then in his office. Later that day Gutjahr, Consolidated's treasurer, on Trueblood's direction, returned Groban's call. (Trueblood dep., p. 32). Groban told Gutjahr that it was necessary for Consolidated to obtain a prime rating from N.C.O. in order to borrow money from Ohio. Gutjahr was further advised to contact Merker about the details and requirements for obtaining such rating from N.C.O. (Gutjahr dep., pp. 11–13). During January 23, 1970, Groban called Merker, identified himself as vice-president of Crofters, and expressed an interest in N.C.O.'s commercial rating service. He further told Merker that Crofters was interested in obtaining a rating for its client, Consolidated, for the commercial paper market. Merker has testified that Groban told him that the notes Consolidated intended to issue had a term of 120 days. (Merker dep., pp. 22–26). Groban denies that he ever made such a representation. See affidavit of Harry Groban dated April 20, 1972 at p. 2, attached as Document # 3 to Crofters brief in support of motion for summary judgment. A question of fact exists as to this conversation.

Later on the same day Gutjahr called Merker. Merker outlined the documents that Consolidated would have to submit in order for N.C.O. to appraise the company's liquidity for the purpose of rating its commercial paper. The papers requested by Merker included financial statements, prospectuses and the names of Consolidated's banks.[11] These documents were sent to Merker by Gutjahr on January 23, 1970 (Gutjahr dep., pp. 11–17; and Exhibit 18A to Gutjahr's deposition). Gutjahr had no discussion with Merker concerning the terms or amounts of the notes that were to be issued (Gutjahr dep., pp. 16–17). Consolidated was informed by letter of January 27, 1970, from Merker to Gutjahr, that it had been rated prime for the commercial paper market. (Exhibits to deposition of Kerr).

Pursuant to its agreement with Trueblood, Regency Income, through its house counsel Crew, prepared a promissory note for Consolidated to sell to the State of Ohio. Crew also prepared a form of resolution of the Executive Committee of Consolidated authorizing the transaction with Ohio, and appointing Crew as attorney-in-fact to act on behalf of Consolidated in connection with such transaction. The note and resolution were executed and certified by Consolidated's Executive Committee and given to Crew for delivery to the Treasurer of the State of Ohio. (Trueblood dep., p. 28; Exhibits 9 and 12 to Gutjahr's deposition). Crew took the documents to Columbus, Ohio and the transaction was closed January 29, 1970, in the office of Ohio's Treasurer. In addition to Crew, Groban and Gardner were present at the closing. The note bought by Ohio was to come due January 28, 1972.

After the closing Crew returned to Groban's office. Groban tendered Crew an invoice of Deegee Company addressed

11. It should be noted, as to all of the transactions discussed, *infra*, that N.C.O. does not rate specific pieces of commercial paper. At no time material herein did N.C.O. see the notes actually sold by Consolidated, Four Seasons and King Resources to the State of Ohio, and there was no requirement that these notes be submitted to N.C.O. for its inspection. An N.C.O. rating is designed to reflect a company's liquidity and ability to redeem its commercial paper. N.C.O. rates companies and not the individual notes of these companies. Its highest rating is prime, followed by ratings of desirable, satisfactory, fair and no rating.

to Consolidated, in the amount of $40,000, for services rendered in connection with this transaction. (Crew dep., pp. 23–29). On January 30, 1970, C. Darby Smith, vice-president of Regency Income, brought to Gutjahr a two-year note from Regency, as payor, to Consolidated, as payee, dated January 29, 1970 for $1,000,000 at 9½% interest. Consolidated then delivered its check to Regency in the amount of $1,000,000 (Gutjahr dep., pp. 51–52). Deegee's invoice for $40,000 was then paid by Regency Income which, pursuant to a prior agreement, reloaned Howard $250,000. Howard in turn paid Regency $10,000 for lending him that sum.

Sometime in the middle of February, 1970, Howard reported to Kerr that an additional $2,000,000 loan might soon become available from the State of Ohio (Kerr dep., p. 23). Kerr was informed that this loan would be for a term of one year at 9% interest. Kerr relayed this information to Trueblood, on or about February 16, 1970, and asked him if Consolidated was willing to borrow the full amount and reloan half of it to Regency Income. Trueblood soon accepted Kerr's request with the understanding that the two conditions which pertained to the first transaction (see, *supra*, at p. 246) would also be applicable to the second. (Trueblood dep., pp. 45–47). On February 17, 1970, Crew brought a $2,000,000 promissory note to

Consolidated's offices. He also prepared and brought a form of resolution of the Executive Committee of Consolidated authorizing the transaction and appointing Crew attorney-in-fact in connection with this transaction. These documents were executed and certified and given to Crew for delivery to the Treasurer of the State of Ohio. (Crew dep., pp. 33–35). The closing of this transaction took place on February 18, 1970 and was similar to the first closing. (Crew dep., pp. 37–38). Crew was handed a Crofters invoice in the amount of $50,000. This sum was paid by Consolidated which was later reimbursed for one-half of the amount of Regency Income. (Crew dep.; pp. 40–42).[12] On or about February 19, 1970, Regency's vice-president, Smith, brought to Gutjahr a one-year note from Regency, as payor, to Consolidated, as payee, dated February 18, 1970 in the principal amount of $1,000,000 at 9% interest. Consolidated delivered to Regency its check for $1,000,000 (Gutjahr dep., pp. 96–97). Regency then, pursuant to a prior arrangement, reloaned $125,000 of the sum it borrowed to Howard. In neither of these loan transactions did Consolidated or any of the other ultimate parties to these transactions disclose to either Ohio's Treasurer or Workmen's Compensation Fund their intent to reloan or to borrow substantial portions of the money obtained from these state agencies.[13]

---

12. The source of funds for the second loan was Ohio's Workmen's Compensation Fund. Under state law the Fund could invest surplus monies in corporate notes provided that note was certified in writing by one or more of the standard rating services "to be of investment quality equivalent to, or higher than, the quality of bonds rated in the third highest investment classification." O.R.C. § 4123.44. In this connection, Groban called Merker and asked him to compare N.C.O.'s prime rating with Standard & Poor's Bond Rating (Merker dep., p. 46). On February 10, 1970 Merker wrote Groban informing him that Consolidated's prime rating was "higher than the third highest [bond] investment classification." This letter was forwarded to the Administrator of

the Fund. Since the three highest bond classifications are AAA, AA and A, Merker's letter indicated that an N.C.O. rating of prime was equivalent to a bond rating of between A and AA.

13. On or about May 15, 1970 Consolidated was requested by James Dayton, Cashier, Office of the Treasurer of the State of Ohio, to redeem its two-year note and substitute therefor a 270 day obligation. Trueblood and Consolidated's Executive Committee agreed to this and so informed the Treasurer's Office on May 20, 1970 (Trueblood dep., pp. 59–63). In May, 1970, Trueblood informed Kerr that Consolidated had need of the $2,000,000 lent Regency. Regency repaid Consolidated on May 25, 1970 with two checks, one post-dated June 10, 1970, the full princi-

On May 19, 1970, following a series of newspaper articles concerning Ohio's loan program, the American Stock Exchange suspended trading in Consolidated stock. The S.E.C. ordered a further suspension of trading in Consolidated stock on May 28, 1970. After an investigation and as a prerequisite for the resumption of over-the-counter trading in its stock, Consolidated was required by the S.E.C. to disclose the facts and circumstances surrounding its Ohio loans. On June 5, 1970, Trueblood sent a letter, under his signature, to the shareholders of Consolidated among others. The contents of this letter, as it relates to the Ohio transactions, fails to disclose the reloaning of the borrowed money to Regency, although it does refer to the fees paid to Crofters.[13a]

### (d)

### *The King Resources Loans*

The Treasurer of the State of Ohio also bought two promissory notes of defendant King Resources. The first, dated April 17, 1970, was for $3,000,000 and a term of two years, the second, dated May 1, 1970, had the same term as the first and was for $5,000,000. King Resources learned of Ohio's investment policies through, once again, Mr. Howard. Howard was introduced to defendant Coffey, vice-president of King Resources, in February of 1970. He told Coffey that he knew of a source of long-term funds which were available on a one, two and five-year basis. Howard further informed Coffey that it was necessary that King Resources have an N.C.O. rating of prime on its commercial paper as a prerequisite to borrowing money from Ohio. (Coffey dep., pp. 7–19).

On February 19, 1970, Groban instructed Coffey to send him certain financial information and banking references. Coffey complied with this request. (Coffey dep., pp. 21–22). In the latter part of February, 1970, Groban called Merker and asked N.C.O. to rate King Resources for the commercial paper market. During the course of this conversation Groban, according to Merker's testimony, represented that the commercial paper King Resources intended to issue was for a term of 120 days and in the amount of $2,000,000. (Merker dep., pp. 87–89). Groban denies that he ever made such a representation. As we have noted above, in regards to a similar conflict in testimony concerning the Consolidated loans, a factual question is raised by this inconsistency.

Because N.C.O. had no file on King Resources, Merker called Coffey and requested him to submit the customary financial data and documentation. (Merker dep., p. 89). Upon receipt of the requested information and investigation thereof, Merker, in a letter to Groban dated February 26, 1970, rated King Resources prime for the commercial paper market. Groban gave a copy of this letter to Gardner and the loans to King Resources were closed as detailed above. King Resources, pursuant to an agreement entered into before the loans were consummated, reloaned $1,500,000 to defendant Colorado Corporation. The details of this agreement were not disclosed to officials of Ohio's Treasurer's Office before the loans were closed. Deegee received a $120,000 finder's fee from King Resources for services rendered in connection with the first loan. Groban has testified that no fee was paid to the Crofters defendants in connection with the second loan, pending their efforts to locate additional money for King Resources (Groban SEC tr., p. 68). Negotiations for the King Resources loans were carried out between Gardner and Groban. (Testimony of Gardner in State of Ohio v. Donahue, et al., No. 49,143, Court of Common Pleas

---

pal and interest due on the loans. On February 16, 1971, Consolidated fully repaid the principal and interest due on its notes to the State of Ohio.

**13a.** See Exhibit 12 to Hegan affidavit, *supra*, attached to plaintiff's memorandum in support of motion for preliminary injunction.

of Franklin County, Ohio, at pp. 21–22, 29; attached to Gardner's affidavit, Document # 6 to Crofters brief in support of motion for summary judgment.)

(e)

*The Four Seasons Loans*

Defendant Clark, Four Seasons' former president, learned of Ohio as a source of financing in January, 1970, through David Ehlers of the Gibraltar Growth Fund. Ehlers told Clark that defendant Howard would contact him and further explain the procedure for borrowing money from Ohio. (Clark dep., March 24 and 25, 1971, pp. 12–15). A meeting between Clark and Howard took place in Oklahoma City during February, 1970. At this meeting Howard told Clark that Four Seasons qualified to borrow as much as $25–30 million from Ohio and that the state's money was available for two to five year loans at interest of 8½% to 9½%. Clark agreed at this time to reloan Howard 20% of any funds borrowed from Ohio at 1% above the interest rate that Four Seasons would be paying to the state, and for an identical term. (Clark dep., p. 28). Howard requested and received from Clark several copies of Four Seasons' annual report and sent four copies of these, along with the corporation's latest interim report, to Groban.

Groban showed the financial information he had received from Clark to Gardner. Although Gardner was concerned that these financial reports revealed considerable assets as account receivables,[14] he told Groban that he would authorize a loan to Four Seasons if it obtained a prime rating from N.C.O. (Groban SEC tr., pp. 28–29; Gardner dep., pp. 10, 27–28, 32–33).

On February 18, 1970, Groban telephoned Merker and told him that he wanted a commercial paper rating for Four Seasons for the commercial paper market. (Merker dep., p. 59). Merker has testified that Groban told him that the proposed amount of the Four Seasons paper was $1,000,000 for a term of 120 days. (Merker dep., p. 59). Groban has denied making this statement, again presenting this Court with a question of fact which cannot be resolved on motion. Groban told Merker to contact John Mee, Jr., Four Seasons' vice-president and general counsel (Merker dep., p. 61), who along with Alex Russell, Four Seasons' comptroller, at Clark's direction, handled all subsequent dealings with Ohio in regard to the loan transactions.

Merker called Mee later during February 18, 1970 and explained that he had received an inquiry from Groban for the purpose of having Four Seasons rated for the commercial paper market. Merker requested that Mee provide N.C.O. with certain financial information respecting Four Seasons. Mee promptly transmitted the requested information to Merker which included a prospectus and annual reports containing financials for the year ending June 30, 1969, an unaudited report for the six months ending December 31, 1969, and bank references. (Merker dep., pp. 61–63). Mee had no discussion with Merker regarding the promissory notes Four Seasons proposed to issue; nor did Merker question him concerning their terms. On March 7, 1970, after examination of the material forwarded and certain additional investigation, N.C.O. rated Four Seasons prime for the issuance of commercial paper and advised Mee and Groban by letter of this rating (Merker dep., pp. 69–70).

---

14. Four Seasons annual and interim reports reflected assets receivables of approximately $9,000,000 as of June 30, 1969 and approximately $30,000,000 as of December 31, 1969 (Groban SEC tr., July 1, 1970, pp. 28–29; Gardner dep., June 2, 1971, pp. 11–13). The plaintiff Commission maintains and defendant

Clark denies that these receivables were substantially overstated. (See Eichstaedt affidavit filed in support of plaintiff's motion for preliminary injunction; Clark's memorandum in support of motions to dismiss and for summary judgment, pp. 39–46).

Upon receipt of Merker's letter Groban reviewed negotiations with Gardner over the terms and conditions of Ohio's loans to Four Seasons. (Groban SEC tr., p. 29). Gardner finally agreed to loan $2,000,000 to Four Seasons for 120 days, at the end of which time the loan would be "rolled over" (i. e., converted) into a two-year loan (Groban SEC tr., p. 29; Gardner dep., pp. 18–19, 27–28, 33–34; Gardner SEC tr., June 29, 1970, p. 123). In addition, Gardner agreed to loan Four Seasons $1,000,000 for two years (Gardner dep., p. 28), and further indicated to Groban that an additional state loan to the corporation could be obtained at the end of March, 1970, for a two-year term (Groban SEC tr., p. 29). No one disclosed to Gardner that, pursuant to Clark's agreement with Howard, 20% of the proceeds obtained from Ohio were to be reloaned to Howard (Gardner SEC tr., p. 76).

Groban then telephoned Howard to report the results of his negotiations with Gardner, apprising him of the loan terms and the amounts available (Groban SEC tr., p. 29). In early March, 1970, Howard informed Clark of the data and terms of the proposed loans from Ohio. After subsequent conversations between the parties to these loans a closing was set for March 9, 1970. On that date Russell, in Groban's presence, delivered three promissory notes of Four Seasons totaling $3,000,000 to Gardner (Groban SEC tr., p. 32). These notes were originally made payable to the Workmen's Compensation Fund but were redrawn and made payable to the State Treasury at Gardner's insistence.[15] A second closing involving the additional note for $1,000,000 for two years was purchased by Ohio on March 23, 1970. The closing for this note was handled by mail pursuant to arrangements made by Gardner at the March 9, 1970 meeting with Groban and Russell.

Four Seasons reloaned $800,000 (less 4 points or $32,000) of the $4,000,000 it received from the State of Ohio to Howard's company, Financial Data Relations, Inc. (Clark dep., pp. 62, 76–77). In addition, Four Seasons paid Deegee $160,000 for its services in connection with the aforesaid loan transactions. (Groban SEC tr., p. 31).

(f)

*The SERS Loans:*
*Counts III and IV*

Between August, 1969 and January, 1970, the Crofters principals arranged for and helped effectuate the sale of various promissory notes to SERS. Under Ohio law, SERS can invest in, among other things, "obligations of local housing agencies . . ." O.R.C. § 3309.15(A)(3).[16] Lore, a non-moving

---

15. Clark has argued that because O.R.C. § 4123.44 does not require a prime rating, and because he was obviously expecting to borrow from the Fund as indicated by the notes as originally drawn, he would not have had any reason to defraud N.C.O. in order to obtain a prime rating. See Clark's memorandum in support of motion for summary judgment, p. 13 n. 1. However, there is nothing in the record which affirmatively indicates that Clark expected at the time Four Seasons obtained the prime rating that he was to deal with the Fund; there is no indication that he made any distinction between the two, separate sources of state monies. The original, unused notes payable to the Fund were redrawn without apparent protest.

16. O.R.C. § 3309.15(A)(3) provides in relevant part as follows:

The members of the school employees retirement board shall be the trustees of the several funds created by section 3309.60 of the Revised Code. The board may invest such funds in any bonds, notes, certificates of indebtedness, mortgage notes, stocks, shares, debentures, or other obligations, or securities described below:

(A) The following obligations of the federal government and related agencies: . . .

(3) Obligations of local housing agencies which obligations are secured either by a requisition agreement or by an annual contributions contract by and between the local housing agency and the public housing administration . . .

defendant, was until October, 1969, the investment officer of SERS and thereafter, until January, 1970, its special consultant. During this period Lore had authorization from SERS' board to issue letters of commitment on behalf of the board. The board would meet every three to four weeks to review and ratify Lore's investment decisions. Lore was also authorized to prepare interim SERS Board Resolutions authorizing a given loan so that the borrower could receive his first payment from the state's Treasury. The promissory notes given in return for these advances and commitments were not cosigned, as required under state law, by various local housing agencies. However, in his "Summary of Investment Transactions" that he prepared from time to time for presentation to the SERS board, Lore described the notes that SERS was committed to buy from Crofters as "local Housing Agency Notes." (See Exhibit 6 to the affidavit of Donald Dreyfus dated November 13, 1970 attached to plaintiff's memorandum in support of motion for preliminary injunction).

Under this arrangement SERS through Lore committed itself to buy $28,766,850 worth of promissory notes of individual or corporate borrowers. The Crofters defendants received cash fees totaling $605,000 for arranging the sale of these various promissory notes. Defendant, LCM, a corporation controlled by Lore, received $47,831.25 in fees from Crofters for services rendered in connection with obtaining the commitments from SERS. During the time these commitments were obtained LCM was renting office space and occupying a portion of Crofters' suite. Of the amount committed by Lore or his successor, $19,526,850 was ratified by the SERS board and $4,000,000 was actually disbursed before the board ordered an investigation into these loans. Crofters notes in its brief in support of its motion for summary judgment, that as moneyfinders they "were interested only in a source that would provide a letter of commitment. For this they were paid." At 21.[17]

## IV

## OPINION

### (a)

#### *The N.C.O. Ratings*

Lying at the very heart of the S.E.C.'s complaint is the question of whether the defendants (with the exception of defendants Lore and LCM) violated Sections 17(a), 10(b) and Rule 10b–5 of the securities laws, either through their acts or omissions, in obtaining prime ratings from N.C.O. It must be kept in mind that a prime rating from N.C.O. is an irreducible statutory requirement that must be satisfied by corporate borrowers before they may be eligible to receive funds from the state Treasury. See n. 7, *supra.*

Under the S.E.C.'s view of this case the fraudulent obtaining of prime ratings by Consolidated, King Resources and Four Seasons, as assisted by the other defendants, was the lubricant which allowed the alleged fraud against Ohio to proceed smoothly. The Commission contends that this alleged fraud was furthered by the making of either explicit or implied representations to N.C.O., and to Merker in particular, that the defendant corporations intended to issue commercial paper, whereas in fact they were seeking longer term financing through the issuance of non-commercial

---

17. In total Crofters obtained commitments for twenty-five construction projects for twelve developers. As noted, the amount of these commitments was $28,766,850. The standard fee Crofters charged for obtaining these commitments averaged between two and four points. However, in three loans Crofters required the borrowers to enter a joint venture with them, under which they received a one-half interest in the building projects. The estimated cost of the projects covered by these joint venture agreements was approximately $11,760,000. Crofters' interest in these particular projects was not disclosed to SERS (See Exhibit 1 to Dreyfus affidavit, *supra;* Dreyfus affidavit, *supra,* paragraphs 8–14).

paper. As this Court has previously noted, N.C.O. defines commercial paper as an unsecured promissory note with a maturity term not exceeding 270 days, the proceeds of which are used for working capital purposes. (*Supra,* p. 244; Merker dep., p. 12). The moving defendants counter this argument by noting that commercial paper is not so restrictively defined under Ohio law; that N.C.O. did not give notice of its definition of commercial paper to the corporations that requested ratings and consequently the various defendants were ignorant of such a definition; and that since N.C.O. rates companies, and not the individual notes issued by these companies and because the companies were properly rated prime, no fraud was committed by the obtaining of these ratings.

The first question before this Court is whose definition of commercial paper should govern the law of this case. Our analysis of this issue must begin with the plain words of O.R.C. § 135.14. As indicated above, this statute authorizes the state Treasurer to invest in commercial paper notes issued by private corporations where "such notes are rated prime by the National Credit Office, Inc., New York . . ." *supra,* n. 7. It should by now be obvious that this statute contains a latent error insofar as N.C.O. does not rate individual notes but rather a company's ability to redeem the commercial paper notes it issues. But if anything, by making reference to the rating of individual notes as opposed to entire companies, this statute imposes a heavier duty on the prospective issuer

than the one the defendants at bar are willing to assume. The statute appears to contemplate that investments in the notes of corporations for profit are inherently of higher risk than are the investments authorized by O.R.C. § 135.-14(A), (B), (C) and (D). See, *supra,* n. 7. Even a casual reading of the statute discloses that whereas the Treasurer was permitted to invest freely in obligations of the United States and the State of Ohio maturing within two years, his investments in commercial paper of corporations for profit was limited to notes rated prime by N.C.O. The statute, therefore, seeks to insure that investments in the notes of corporations for profit be certified to be of low risk by an objective rating agency.

Since § 135.14 does not purport to define commercial paper N.C.O.'s definition of this term, if reasonable, must necessarily govern the resulting legal relationships of the parties. The reason for this is that N.C.O. is, by specific statutory reference, Ohio's statutory agent or "designated agency" for this purpose. See, 1970 Opinions of the Attorney General, No. 70–067 at 3.

It is this Court's opinion that N.C.O.'s definition of commercial paper is not unreasonable. It is clearly consistent with, and should be read in conjunction with, Section 3(a)(3) of the Securities Act of 1933, which specifically exempts from the registration requirements of Section 5 commercial paper with a term of 270 days or less.[18] It is true, as defendants argue, that there is no universally accepted definition of commercial

---

18. Section 3(a)(3), 15 U.S.C. § 77c(a)(3) provides that:

 (a) Except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities: . . .

 (3) Any note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months,

exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

 The S.E.C. has not charged any violation of Section 5 of the 1933 Act, 15 U.S.C. § 77e, which has been referred to as "the heart of the statute." 1 Loss, Securities Regulation, 180 (2d ed. 1961). This is so because the transactions in issue were private placements and therefore exempted transactions within the meaning of Section 4(3) of the Act, 15 U.S.C. § 77d(3).

paper as regarding term of maturity.[19] Defendants have failed, however, to undercut plaintiff's argument that N.C.O.'s definition is inconsistent with the manner in which commercial paper is generally and customarily regarded both by the securities business and under federal securities law. Judge Bohanon, in denying Ohio's petition for reclamation in The Matter of Four Seasons, 329 F. Supp. 647, 651 (W.D.Okl., 1971) (discussed *infra*, pp. 259–261) underscored the customary definition of this term when he noted:

> The commercial paper rating given by [N.C.O.] is really of no significance in this case because in truth and in fact the State of Ohio purchased no commercial paper from the [defendant] corporation. All of the paper purchased by Ohio was for a period of two years which is not commercial paper (Finding of Fact No. 10, *supra*) (Appendix B to Consolidated's memorandum in support of motion for summary judgment).

▮ Unless terms are legislatively or judicially defined courts will generally accept the *definition customary* in the relevant industry. See Hart and Sacks, The Legal Process, Problems 1, 13, 14 and passim (tent.ed. 1958). Custom, from the time of the ancient Law Merchant to this day, has been one of the major sources for the development and invigoration of the law. In the absence of contrary legislative edict or judicial precedent, it is generally considered to be binding upon the courts. See Gillarde Co. v. Martinelli & Co., 168 F.2d 276 (C.A.1, 1948), opinion amended on rehearing, 169 F.2d 60 (C.A.1, 1948), cert. den. 335 U.S. 885, 69 S.Ct. 237, 93 L.Ed. 424 (1948); Dixon, Irmaos & CIA, Ltda. v. Chase National Bank, 144 F.2d 759 (C.A.2, 1944), Hart and Sacks, The Legal Process, passim. Only when the custom of a given industry is deemed negligent in the light of subsequent technological developments will judicial law override industry custom. See The T. J. Hooper, 60 F.2d 737 (C.A.2, 1932) (*per* L. Hand, J.).

▮ These principles are now embodied in the Uniform Commercial Code. See U.C.C. § 1–205(2), (3) and (4). In the absence of express terms modifying a usage of trade, the customs of the industry, at the place where any part of the agreement is to be performed, will govern and will be respected by the courts. See U.C.C. § 1–205(4) and (5). Because § 135.14 requires prospective borrowers be rated prime by the standards of the national securities industry in general and by N.C.O., a New York corporation, in particular; and because there was no express modification of these standards by the defendants at bar, they should be held to knowledge of the general definition of commercial paper as used by N.C.O. Legal definitions of this term in other jurisdictions are therefore irrelevant in determining whether the defendants violated the federal securities laws. The fact that neither Merker nor N.C.O. clarified their definition of commercial paper to the defendants is equally without legal rele-

---

19. The "Blue Sky" laws of twenty-four jurisdictions contain provisions for exemption from registration similar to Section 3(a)(3), *supra*, in that the maximum maturity for exempt commercial paper is set at nine months. The laws of twenty-one other jurisdictions contain exemptive provisions which either set no limit for the term of exempt commercial paper or else set limits other than nine months. The statutes of Mississippi, Oregon, Pennsylvania and Ohio specify no limit as to term. See, O.R.C. § 1707.02(G). However, O.R.C. § 1101.01(H) of the Banking Laws defines commercial paper as maturing within one year. Commercial paper, generally, is not defined as to maturity in the Uniform Commercial Code, as· this is considered a matter for local law. See U.C.C. § 3–104, Comment 1. The S.E.C. does not, it should be noted, allege a violation of Ohio's Securities Law in the instant suit. But even assuming *arguendo* that the one year maturation definition of commercial paper contained in O.R.C. § 1101.01(H), *supra*, were applicable, it would be of little aid to the defendants herein, as the great majority of defendants' loans were for terms greater than one year.

vance. Persons proceed in ignorance of law, including securities law, at their own peril. The burden of avoiding a mutual mistake as to the definition of commercial paper was upon the various defendants who had dealings with N.C.O. It was to their advantage to redress any failure of communication.

Since the loans involved in this suit were authorized under a specific statutory provision, the express standards as set forth in that statute must be deemed controlling. The standard embraced by and incorporated by reference into O.R.C. § 135.14 is the one employed by N.C.O. Since there is nothing arbitrary or unreasonable about N.C.O.'s definition of commercial paper but as it is, instead, collaterally supported both by Section 3(a)(3), *supra,* and by the custom of the national security industry, it must be afforded appropriate deference. N.C.O. defines commercial paper as having a term not to exceed 270 days and this Court accepts that definition.

None of the notes issued by the corporate defendants in the action at bar satisfied N.C.O.'s definition of commercial paper. N.C.O. only rates companies for the purpose of redeeming commercial paper of nine-month term or less. When a company issues a note of a term in excess of nine months, the prefix "prime" is not properly affixed to such a note, and N.C.O. has not necessarily assessed the company's long term financial prospects. Other Wall Street agencies, which rate long-term paper and bonds, exist to perform this separate function. Merker has testified that if he had known that the defendant corporations were intending to issue notes of a term in excess of 270 days, N.C.O. would not have rated them for the commercial paper market (Merker dep., pp. 86, 260–61). It is clear from the record now before us that the various defendants were interested in obtaining long-term financing for periods in excess of nine months. (See *supra,* pp. 245, 248–250).

On the state of facts now before us, the Court concludes that for the defendants to use the word "prime" in connection with non-commercial paper notes was to employ that term in a manner for which it was not intended. The borrowers knew or should have known that such an impermissible use would tend to confuse and mislead prospective purchasers. Such conduct is violative of the spirit and underlying policies of the federal securities law. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (April 27, 1972); Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Securities & Exchange Commission v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

Accordingly, on the state of facts now before us, the Court concludes that the defendants' use of the word "prime", as defined by N.C.O. and the custom of the securities industry, in connection with notes of terms in excess of 270 days, constituted a violation of the standard promulgated in O.R.C. § 135.14. Further, that such use of the term "prime", in connection with non-commercial paper tended to operate as a "device, scheme, or artifice to defraud" within the meaning of Sections 17(a)(1) and of Section 10(b) and Rule 10b–5(1) thereunder; and further constituted the engaging in a "transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser" within the meaning of Section 17(a)(3) and Section 10(b) and Rule 10b–5(3) thereunder. See Affiliated Ute Citizens v. United States, *supra;* Securities & Exchange Commission v. Capital Gains Research Bureau, *supra.* This conduct on the part of the defendants constitutes activity which should be enjoined by the equitable powers of this Court. See Britt v. Cyril Bath Co., 417 F.2d 433 (C.A.6, 1969); Securities & Exchange Commission v. Barraco & Company, 438 F.2d 97 (C.A.10, 1970); Securities & Exchange Commission v. North American Research and Development Corp., 424 F.2d 63 (C.A.2, 1970); Nees v. Securities & Exchange Commis-

sion, 414 F.2d 211' (C.A.9, 1969); Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673 (N.D.Ind., 1966), aff'd. 417 F.2d 147 (C.A.7, 1969), cert. den. 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); Anderson v. Francis I duPont Co., 291 F.Supp. 705 (D. Minn., 1968).

■ Our view is that the securities laws are to be broadly construed to prevent fraud. Such view is consistent with recent pronouncements by the Supreme Court and with the underlying policies of the Securities Acts. The Supreme Court has recently noted, with reference to Section 10(b) and Rule 10b–5 thereunder, that:

> These proscriptions, by statute and rule, are broad and, by repeated use of the word "any," are obviously meant to be inclusive. The Court has said that the 1934 Act and its companion legislative enactments [including the 1933 Act] embrace a "fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and this to achieve a high standard of business ethics in the securities industry." Securities & Exchange Commission v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In the case just cited the Court noted that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id.*, at 195, 84 S.Ct. at 285.

See, Affiliated Ute Citizens v. United States, 406 U.S. 128, at 151, *supra*, 92 S.Ct. 1456, at 1471 (footnotes omitted); also see Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Securities & Exchange Commission v. Texas Gulf Sulphur, 401 F.2d 833 (C.A. 2, 1968), cert. den., sub nom. Coates v. Securities & Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

The Court in *Affiliated Ute Citizens, supra,* specifically distinguished between violations of Rule 10b–5(2) and the other provisions of that Rule in a manner highly relevant to the instant case. The Court, *per* Justice Blackmun, wrote:

> We conclude, however, that the Court of Appeals erred when it held that there was no violation of the Rule unless the record disclosed evidence of reliance on material fact misrepresentations by Gale and Haslem . '. . . *We do not read Rule 10b–5 so restrictively. To be sure, the second subparagraph of the rule specifies the making of an untrue statement of a material fact . . . . The first and third subparagraphs are not so restricted.* These defendants' activities, outlined above, disclose, within the very language of one or the other of those subparagraphs, a "course of business" or a "device, scheme or artifice" that operated as a fraud upon the Indian sellers.

406 U.S. *supra*, at 152, 92 S.Ct. at 1471 (emphasis supplied; also see Superintendent of Insurance v. Bankers Life & Casualty Co., *supra*. Although the underlying facts of *Affiliated, supra,* are readily distinguishable, its general principle is applicable to the case at bar.

■ We note that our holding on this issue is not dependent on whether Groban actually misrepresented the terms of the various notes to Merker. What is actionable in this case is the use of prime ratings, regardless of how they were obtained, for a purpose which would tend to confuse and mislead the purchasers. Holding as we do, it is unnecessary to consider whether there was a material omission within the meaning of Section 17(a)(2) and Rule 10b–5(2). Defendants had the obligation to insure that the ultimate use of the prime ratings did not violate other provisions of Section 17(a) and 10(b). This obligation on their part might well have cautioned them to reveal that the terms of the various notes they intended to issue were in excess of 270 days and therefore

not properly submitted for a prime rating. Deciding as we do, however, this determination is extraneous to the necessary grounds of our holding.

The defendants who directly participated in obtaining prime ratings for Consolidated, Four Seasons and King Resources knew or should have known that the notes ultimately issued were not properly described by the word "prime." These defendants, namely, the three rated corporations (Consolidated, Four Seasons and King Resources), Crofters, Deegee, Regency Acceptance, Donahue, Griffith and Groban will be held to the standard set forth above and should be enjoined from such further acts in the future. Defendants Trueblood, Clark and King, as responsible officers of the rated companies, should be enjoined for similar reasons. Defendants Regency Income, Colorado Corporation, Coffey, Howard and Kerr will be deemed as aiders and abettors to the deceptive scheme and should also be enjoined.[20] See Securities & Exchange Commission v. Barraco, *supra*; Securities & Exchange Commission v. Great American Industries, Inc., 407 F.2d 453 (C.A.2, 1968), cert. den. 395 U.S. 920, 89 S.Ct. 1770, 23 L. Ed.2d 237 (1969); Securities & Exchange Commission v. Culpepper, 270 F. 2d 241 (C.A.2, 1959); Anderson v. Francis I duPont Co., *supra*; Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y.1963).

(b)

*The SERS Loans*

On the basis of the evidence now before us (as summarized at pp. 250–251, *supra*), the Court is of the belief that the Crofters defendants, acting in concert with defendants LCM and Lore, violated Sections 17(a), 10(b) and

**20.** Defendant Kerr's argument that he should not be enjoined because he was a peripheral member of the scheme and because he lacked financial motivation is unpersuasive in light of Securities & Exchange Commission v. North American Research and Development Corp., 424 F. 2d 63 (C.A. 2, 1969). Also see Securities & Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 835 (C.A. 2, 1968), cert. den. sub nom. Coates v. S.E.C., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). As these cases indicate acts which are illegal under the securities law, whether motivated by friendship or other non-pecuniary reasons, are properly subject to injunction. Kerr also argues that he did not utilize the facilities of interstate commerce in connection with the Ohio loan transactions. The local use of the telephone satisfies the jurisdictional requirement under Section 10(b) and Rule 10b–5 thereunder since the telephone system is an "instrumentality of interstate commerce" even when the particular telephone conversation does not cross state lines. Lennerth v. Mendenhall, 234 F. Supp. 59 (N.D.Ohio, 1964); Nemitz v. Cunny, 221 F.Supp. 571 (N.D.Ill., 1963); see *contra*, Rosen v. Albern Color Research, Inc., 218 F.Supp. 473 (E.D.Pa., 1963). Trueblood and Kerr first discussed the transactions over the telephone in Denver (Trueblood dep., pp. 6–9, 20).

Two other points should be considered in passing. First, Consolidated, Trueblood, and Kerr argue that since Ohio suffered no monetary loss as a result of the transactions involving Consolidated this action against them should be precluded. This issue is not determinative as this injunction action is directed against certain illegal acts and does not seek to recover funds lost by the State of Ohio. See Otis & Co. v. Securities & Exchange Commission, 106 F.2d 579 (C.A.6, 1939); Securities & Exchange Commission v. Torr, 15 F.Supp. 315 (S.D.N.Y., 1936), reversed on other grounds, 87 F.2d 446 (C.A.2, 1937); Securities & Exchange Commission v. Capital Gains Research Bureau, *supra*. We note that the state did not fare as well, financially, in some of the other transactions. Second, these defendants contend that the transaction of February 17, 1970 was with the Fund and did not require a prime rating. We note, however, that the Fund did require a certification that a note rated prime was at least equivalent to a bond rated A. Merker made this conversion in his letter to Groban dated February 10, 1970. See n. 13, *supra*, at p. 247. The use of the word prime in this connection in regard to non-commercial paper is equally actionable under the securities laws.

Rule 10b–5, thereunder by failing to comply with O.R.C. 3309.15(A)(3). An injunction should issue on the basis of said evidence.

### (c)

*Res Judicata and Collateral Estoppel*

Various defendants maintain that the present action is barred either by the doctrine of *res judicata* or by the related doctrine of collateral estoppel. The claims of these various defendants will be treated separately below.

### (1)

*King Resources*

Defendant King Resources has moved for dismissal of this suit on the grounds that a decree of final judgment of permanent injunction by consent, issued in Securities & Exchange Commission v. King Resources Company, Civil Action No. C–2858 (D.Colo., February 9, 1971) is *res judicata* as to the suit now before the Court. In the Colorado proceedings the S.E.C. sought and successfully obtained a permanent injunction against King Resources enjoining that company from violating Section 5 of the Securities Act of 1933. The injunction further provided that King Resources would not violate Section 17(a) and Rule 10b–5 in connection with the sale of its securities in regard to, but not limited to, the following specifics:

"(1) the financial condition of the issuer;

(2) present or projected sales or profits from operations of the issuer;

(3) loans made by the issuer;

(4) the financial condition of persons indebted to the issuer;

(5) guarantees of indebtedness owing to the issuer;

(6) lack of authority from the issuer's board of directors for disbursement of monies by the issuer."

*Supra,* at 3. The S.E.C. now argues that the injunction of the District Court of Colorado does not cover the acts complained of in the present suit. The S.E. C. notes that the Colorado Court merely enjoined King Resources from committing fraud in connection with the offer or sale of its own securities, while the suit before us seeks injunctive relief against deception in the offer or sale of *any* security. In addition the S.E.C. has further prayed in the present suit for "such other or further relief as the Court may deem necessary or appropriate".

While it is true that a "consent decree will not be expanded beyond the meaning of its terms when read in the light of the issues raised and the purpose for which [the] suit was brought", Great Lakes Carbon Corp. v. Eagle Lumber Dealers Supply Co., 402 F.2d 106, 108 (C.A.7, 1968); Terminal R.R. Assn. of St. Louis v. United States, 266 U.S. 17, 29, 45 S.Ct. 5, 69 L.Ed. 150 (1924); Southern Ry. Co. v. Brotherhood of Locomotive Firemen, 119 U.S.App.D.C. 91, 337 F.2d 127, 136 (1964) we think the Colorado decree can fairly be read to extend to and enjoin the acts now charged against the defendant. The injunction of the Colorado Court, which paraphrases the language of Section 17(a) and Rule 10b–5 may properly be construed to prohibit the acts committed by King Resources which the S.E.C. now wishes to further enjoin. See Mills v. Green, 159 U.S. 651, 16 S.Ct. 132, 40 L.Ed. 293 (1895).

The minor differences between the injunction granted in Colorado and the one sought in this Court are not, in our opinion, of legal significance. The gravamen of the S.E.C.'s present action is to enjoin King Resources from violating the securities laws in regard to *its* securities and this it has already been prohibited from doing by the United States District Court for the District of Colorado. To the extent King Resources re-loaned money to other defendants herein, in violation of Section 17(a)(2) and Rule 10b–5(2), it has now been restrained from continuing to do so in the future. To the extent these other party

defendants, having some connection with King Resources were not affected by said injunction, they remain proper parties before this Court. We therefore hold that the injunction issued by the Colorado Court in Securities & Exchange Commission v. King Resources Company, *supra*, is *res judicata* to the present suit, as to that defendant, and may properly be set up as a bar to this action. Mills v. Green, *supra*. The motion for summary judgment of defendant King Resources will consequently be granted.

### (2)

### *The Crofters Defendants*

Defendants Donahue, Griffith and Groban and the companies with which they are connected contend that the present action should be dismissed as to them on the grounds of *res judicata* and collateral estoppel. They base this contention on the results reached by two other courts on matters similar to those advanced at bar. See In the Matter of Four Seasons Nursing Centers of America, Inc., 329 F.Supp. 647 (W.D.Okla., 1971) (Memorandum Opinion *per* Judge Bohanon); State of Ohio v. Donahue, et al., No. 49,143, Court of Common Pleas of Franklin County, Ohio, Criminal Division. (Directed verdict of Judge Cook dated March 3, 1972). In the Oklahoma proceeding referred to by these defendants, Judge Bohanon denied the State of Ohio's petition for reclamation brought under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq., for the reorganization of Four Seasons. This proceeding will be discussed in greater detail in section (3) below. In the Ohio proceeding Judge Cook directed a verdict in favor of the Crofter principals, who were indicted and tried under O.R.C. § 2911.-03.[21]

These contentions of the Crofters defendants are without merit. As the Supreme Court of the United States has stated in Lawlor v. National Screen Service, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955):

> The basic distinction between the doctrines of *res judicata* and collateral estoppel . . . has frequently been emphasized. Thus under the doctrine of *res judicata*, a judgment "on the merits" in a prior suit *involving the same parties or their privies* bars a second suit based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, such a judgment precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit. *Id.*, at 326, 75 S.Ct., at 867. (emphasis supplied and footnotes omitted.)

See *accord*, Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1877); United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922); Sunnen v. Com'r, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); In re Constructors of Florida Inc., 349 F.2d 595 (C.A.5, 1965); Towle v. Boeing Airplane Co., 364 F.2d 590 (C.A.8, 1966); Cream Top Creamery v. Dean Milk Co., 383 F.2d 358 (C.A.6,

21. O.R.C. § 2911.03 False Statements

No person shall knowingly make or cause to be made, either directly or indirectly, or through any agency, any false statement in writing, with intent that it shall be relied upon, or, knowing that a false statement in writing has been made by another with such intent, respecting the financial condition, property indebtedness, means, or ability to pay, of himself or any other person, firm, or corporation, in which he is interested or for which he is acting, and upon the faith thereof procure, by himself or by some other person for or in collusion with him or with his knowledge, in any form, either the delivery of personal property, or chose in action, the payment of money, the making of a loan or credit, the extension of a credit, the discount of an account receivable, or the making, acceptance, discount, or indorsement of a bill of exchange, promissory note, or other commercial paper, either for the benefit of himself, or such person, firm, or corporation.

1967); Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 421 F. 2d 1313 (C.A.5, 1972); also see 1 D Moore's, Federal Practice, ¶¶ 0.405 [1] and [3]; 0.441 [1] and [2].

The Crofters defendants do not present a question of *res judicata*. The injunction action now pending before us is a different and distinct cause of action from those decided by the Oklahoma and Ohio courts. Nor does the defendants' argument fare more successfully under collateral estoppel notions. Collateral estoppel has been succinctly defined as follows:

> Where there is a second action between parties or their privies, who are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended.

1 B Moore's, *supra*, ¶ 0.441 [2] at 3777 (footnotes omitted). There is no need to explore the intricacies of this doctrine or for us to determine what was ultimately proved in the Oklahoma and Ohio proceedings. See Evergreens v. Nunan, 141 F.2d 927 (C.A.2, 1944); 1 B Moore's, *supra*, ¶ 0.442 [2].

The Court need only note that the Crofters defendants were not involved in the Oklahoma proceeding and the S.E.C. was not involved in the state criminal action against these defendants. Nor can it seriously be maintained that Four Seasons was a privy of these defendants or that the State of Ohio functioned in such a capacity for the S.E.C. See Lawlor v. National Screen Service, *supra*, 349 U.S. at 329, 75 S.Ct. 865;

Gratiot County State Bank v. Johnson, 249 U.S. 246, 39 S.Ct. 263, 63 L.Ed. 587 (1919); Restatement, Judgments, § 83, Comment a; also see Brigham v. Fayerweather, 140 Mass. 411, 5 N.E. 265 (1885); Griffin v. United States, 400 F.2d 612 (C.A.6, 1968); Clyde v. Hodge, 413 F.2d 48 (C.A.3, 1969); Davis v. Eide, 439 F.2d 1077 (C.A.9, 1971); and see generally cases cited, 1 B Moore's Federal Practice, ¶ 0.411 [1]. Since the Crofters defendants were not in privity with the parties involved in the Oklahoma proceeding, and since the S.E.C. was not in privity with the parties involved in the Ohio proceeding, those proceedings cannot estop the present injunction suit against such defendants. Their contentions are therefore without merit and their motion for summary judgment on these grounds will therefore be denied.

### (3)

### *Clark*

Defendant Clark argues that Judge Bohanon's order of July 14, 1971, entered in the Oklahoma proceeding referred to above, estops the S.E.C. from continuing the present action against him. The legal principle which Clark asserts to be applicable is that: "The disallowance of a claim asserted by a party in a bankruptcy proceeding is a final judgment which may be asserted as a bar to further litigation respecting the same operable facts as between those who were parties to the bankruptcy, or their privies." Clark's memorandum in support of motion for summary judgment, at 81. As Clark's statement of the issue makes clear this Court must determine whether the S.E.C. was a party, within the meaning of the doctrine of collateral estoppel, to the bankruptcy proceeding in Oklahoma.[22]

---

22. As we have previously noted, the doctrine of collateral estoppel precludes the relitigation of issues determined in a prior suit between the parties even though the second suit may involve an entirely different cause of action. *Res judicata*, however, only bars a second suit, between the same parties, on the same cause of action actually decided in the first suit. See Lawlor v. National Screen Service Corp., *supra*. It is obvious to this Court that the determination of common law fraud within the framework of a bankruptcy proceeding constitutes a dif-

Section 208 of the Bankruptcy Act, 11 U.S.C. § 608 provides that the Securities & Exchange Commission may participate in corporate reorganization proceedings under Chapter X.[23] Two things must be noted regarding this statutory provision: first, the right to permit the S.E.C. to intervene under Chapter X is discretionary with the District Judge; second, the S.E.C., when permitted to so intervene, is not allowed a right of appeal from the District Court's determinations.

The limitations on the S.E.C.'s right to participate in Chapter X proceedings are consistent with the purpose and legislative history of Section 208. Professor Loss remarked that the Commission's "sole function [in Chapter X proceedings] is to act as an impartial representative of investors and expert advisor to the Courts in judicial reorganization proceedings." II Loss, *supra*, at 755. The Tenth Circuit has noted that the

> scope of the Commission's participation as a "party in interest" has been restricted by the legislative history of the Bankruptcy Act which indicates the function of the Commission in Chapter X proceedings is that of an impartial advisor, "in the role of amicus curiae." Senate hearings on H.R. 8046, 75th Cong.2nd Sess. 12 (1937–38) . . .

Securities & Exchange Commission v. Templar, 405 F.2d 126, 128 n. 4 (C.A.10, 1969); also see 6A Collier, Bankruptcy ¶ 9.27 at 324 (14 ed., 1965).

While it is true that once admitted to a Chapter X proceeding the S.E.C. has the right to participate as a party, see Securities & Exchange Commission v. Krentzman, 397 F.2d 55 (C.A.5, 1968) and will be expected to observe the procedural rules of the forum, see Securities & Exchange Commission v. Bloomberg, 299 F.2d 315 (C.A.1, 1962) its participation is necessarily impinged by the limited role envisioned for the agency by Section 208. A Chapter X proceeding is fundamentally directed to the administration of the bankrupt estate and the evolution of a plan of reorganization. A proceeding of this kind cannot be seen as being in any way comparable to the S.E.C.'s general mission, which is to regulate the securities industry and enforce the policies of the federal securities laws. These dual functions of the Commission may occasionally be at variance and in tension with one another.

The Oklahoma proceeding involved Ohio's attempt to have the four million dollars it loaned Four Seasons removed from that corporation's bankrupt estate. The state's petition for reclamation alleged acts of fraud similar to those advanced at bar by the S.E.C. But the Court is unable to find any ra-

ferent cause of action than Rule 10b–5 securities law fraud in the context of an S.E.C. injunction proceeding. See III Loss, Securities Regulation, 1430–1439; also see In the Matter of Four Seasons Nursing Centers of America, Inc., *supra*, Conclusions of Law No. 1 (July 14, 1971). Similarly, there are obvious differences between the present suit and the state criminal indictment against the Crofters principals charging violations of the state law prohibiting the making of false statements. For these reasons both the Crofters defendants in section (2), above, and Clark presently are raising issues which go only to the doctrine of collateral estoppel. *Res judicata* is not properly involved. The threshold question remaining before the Court, therefore, is whether the S.E.C. was a party to the Oklahoma proceeding under the doctrine of collateral estoppel.

23. 11 U.S.C. § 608 reads:

> The Securities and Exchange Commission . . . may upon its own motion if approved by the judge, file a notice of its appearance in a proceeding under this chapter. Upon the filing of such a notice, the Commission shall be deemed to be a party in interest, with the right to be heard on all matters arising in such proceeding, and shall be deemed to have intervened in respect of all matters in such proceeding with the same force and effect as if a petition for that purpose had been allowed by the judge; *but the Commission may not appeal or file any petition for appeal in any such proceeding.* (emphasis supplied)

tionale, either logical or legal, which would put the S.E.C. to the burden of aligning itself with Ohio in the bankruptcy action and proving its case against Four Seasons in that proceeding. In its role as advisor to the District Court of Oklahoma the S.E.C. may have believed that the denial of Ohio's petition for reclamation was in the best interest of the bankrupt's creditors and investors. But this should not be permitted to estop the Commission, in its role as enforcer of the law, from seeking to have the conduct which led to the Chapter X proceeding, condemned and enjoined in another forum.

Additionally, we note that the Commission is not given the right to appeal from those Chapter X proceedings in which it intervenes. Although Professor Loss observes that the S.E.C. can circumvent this restriction either by joining in another party's appeal or by appealing as *amicus curiae*, II Loss, *supra*, at 756, we are reluctant to apply the doctrine of collateral estoppel to a party who has only a tenuous, unpredictable and discretionary right of appeal. See New York Telephone Co. v. Maltbie, 291 U.S. 645, 54 S.Ct. 443, 78 L.Ed. 1041 (1934).

On the basis of the foregoing authorities it is clear to this Court that the S.E.C.'s participation in Chapter X is primarily as an advisor and not as an adversary. There is no affirmative requirement that the S.E.C., once admitted to a Chapter X proceeding, try its injunction suit in that forum, even though some of the defendants it will later seek to enjoin are involved in the bankruptcy action. The rule should not be different even though some of the issues before the bankruptcy forum are similar to those that will be raised later by the S.E.C. in a different forum. See Rachel v. Hill, 435 F.2d 59 (C.A.5, 1970); Securities & Exchange Commission v. Krentzman, *supra* (1968). Under these circumstances, and especially where the causes of action and the degree of required proof are so dissimilar, the doctrine of collateral estoppel is not proper-

ly invoked in this forum against the S.E.C. by defendant Clark. See Evergreens v. Nunan, 141 F.2d 927 (C.A.2, 1944); Glass v. U. S. Rubber Co., 382 F.2d 378 (C.A.10, 1967); Technograph Printed Circuits Ltd. v. United States, 372 F.2d 969, 178 Ct.Cl. 543 (1967); Rachel v. Hill, *supra*. Defendant Clark's motion for summary judgment on this ground will therefore be denied.

### (d)
### *Propriety of Injunctive Relief*

It is the opinion of this Court that there is sufficient evidence now before us which could support the issuance of an injunction against all of the defendants. Sixteen of the eighteen remaining defendants (all excepting LCM and Lore) defendant King Resources having been dismissed, *supra*, at p. 258, have been found to be in violation of Sections 17(a)(1) and (3) and Rule 10b–5(1) and (3) as detailed in section (a) of this Opinion at pp. 251–257, *supra*. Defendants LCM and Lore have been found to be in violation of the same statutory provisions in respect to Counts three and four of the Complaint. See section (b) of this Opinion at p. 256, *supra*. In addition to these specific findings the Court notes that the evidence adduced by plaintiff Commission, regarding the Whittaker-Vector transactions and Trueblood's letter to Consolidated's shareholders (*supra* at pp. 244–245 and p. 248, respectively) makes out a *prima facie* case which would justify the issuance of an injunction as to these activities as well.

The moving defendants argue that the Court should not grant plaintiff's motion for preliminary injunction because of a lack of "equity". Defendant Clark, who of the defendants has developed this argument most comprehensively, contends that an injunction against him would be improper for the following reasons: first, there has been a cessation of his unlawful conduct during the past two years; second, his past violations were not flagrant; third, the plaintiff has failed to demonstrate that Clark has

a propensity or natural inclination to violate the securities laws; and fourth, the general equities tip in his favor. The other moving defendants assert similar arguments.

■ Contentions of this sort are often made in suits brought under the injunction provisions of the securities law insofar as injunctions are directed to the discretion of the trial judge. Professor Loss has remarked in this regard that:

> The main problem in most actions for injunction instituted by the S.E.C. is whether there is "equity" which is usually reduced to the question whether the violations occurred recently enough to warrant the conclusion that there is a threat that the illegal practices will be resumed . . .

> The ultimate test is whether the defendant's past conduct indicates—under all the circumstances and not merely in view of the time which has elapsed since the last violation—that there is a reasonable likelihood of further violations in the future.

III Loss, Securities Regulation, 1975–1976 (2d ed. 1961). This standard makes it clear that courts should not look solely at the period of time that has elapsed between a violation and an ultimate ruling. This Court is unwilling that a crowded docket be allowed to make activities which were improper in 1969–1970 acceptable in 1972.

■ It is well established that "illegal past conduct gives rise to the inference that there is a reasonable likelihood of future violations" of the securities laws. Securities & Exchange Commission v. Globus International Ltd., 320 F.Supp. 158, 160 (S.D.N.Y.1970); also see Otis & Co. v. Securities & Exchange Commission, 106 F.2d 579 (C.A.6, 1939); Securities & Exchange Commission v. Keller Corporation, 323 F.2d 397 (C.A.7, 1963); Securities & Exchange Commission v. Culpepper, *supra*; Securities & Exchange Commission v. Manor Nursing Centers, Inc., 458 F.2d 1082

(C.A.2, 1972); Tanzer v. Huffiness, 408 F.2d 42, 43 n. 1 (C.A.3, 1969). Once the plaintiff Commission establishes, as they have here, that such violations have occurred, the burden of showing that there is no reasonable expectation that illegal activities will be repeated shifts to the defendants. Securities & Exchange Commission v. Culpepper, *supra*, 270 F.2d at 249. That burden is "a heavy one" and the defendants have failed to sustain it here. See United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Securities & Exchange Commission v. Culpepper, *supra*; Securities & Exchange Commission v. Boren, 283 F.2d 312 (C.A.2, 1960); Securities & Exchange Commission v. Broadwall Securities Inc., 240 F.Supp. 962 (S.D.N.Y., 1965).

Viewing all the circumstances of this case, we conclude that in light of the defendants' past cavalier activities there is reasonable likelihood that the defendants will, in the future, engage in similar conduct.

■ Once a court determines that there exists a reasonable likelihood of future violations of the securities laws, cessation of the unlawful conduct is not a bar to the issuance of an injunction. See United States v. W. T. Grant Co., *supra*; Hecht Co. v. Bowles, 321 U. S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Securities & Exchange Commission v. Pearson, 426 F.2d 1339 (C.A. 10, 1970); Securities & Exchange Commission v. Golconda Mining Co., 291 F. Supp. 125 (S.D.N.Y., 1968); Securities & Exchange Commission v. Electronics Security Corp., 217 F.Supp. 831 (D. Minn., 1963); Securities & Exchange Commission v. Cohn, 216 F.Supp. 636 (D.N.J., 1963); Securities & Exchange Commission v. Scott Taylor & Co., 183 F.Supp. 904 (S.D.N.Y., 1959). In addition, it is well established that proof of scienter is not necessary to justify preliminary injunctive relief. See Securities & Exchange Commission v. Capital Gains Research Bureau, *supra*, 375 U.S.

at 192–194, 84 S.Ct. 275, 11 L.Ed.2d 237; Securities & Exchange Commission v. Pearson, *supra*, 416 F.2d at 1343. Finally, this Court notes that in actions brought by a government agency to enforce by injunction compliance with a statute administered by that agency, "courts go much further to give relief than they are accustomed to go when only private interests are involved." Federal Trade Commission v. Rhodes Pharmacal Co., 191 F.2d 744 (C.A.7, 1951). There is "implied a different standard for S.E.C. actions than for private suits seeking damages." Securities & Exchange Commission v. Fifth Avenue Coach Lines, Inc., 435 F.2d 510 (C.A.2, 1970). In such actions the Court must balance the likelihood of repetition of unlawful conduct with the "legislative intent to leave as few loopholes as possible." Securities & Exchange Commission v. North American Research & Development Corp., *supra*, 424 F.2d at 82.

■ To reiterate the Court's position, it is our conclusion that a reasonable likelihood remains that the defendants, unless enjoined, will commit violations of the securities laws in the future. However, while some courts have granted preliminary injunctions before hearing, see Securities & Exchange Commission v. Globus International, Ltd., *supra*, we think the more proper course is to postpone issuance pending a hearing on the motion. See Securities & Exchange Commission v. Frank, 388 F.2d 486 (C.A.2, 1968); Securities & Exchange Commission v. Barraco, *supra*; Securities & Exchange Commission v. Great American Industries, *supra*. Accordingly, the defendants will be temporarily restrained from violating Sections 17(a) and 10(b) of the securities laws pending a hearing on plaintiff's motion for a preliminary injunction. Such hearing will be consolidated, pursuant to Rule 65(a)(2), Fed.R.Civ.P., with the trial on the merits for a permanent injunction. However, those issues decided in this Opinion, as a matter of law, will not.be deemed before the Court

on hearing on plaintiff's motion. Evidence will be heard at said hearing on the S.E.C.'s charges that the financial data submitted to N.C.O. by Four Seasons was substantially overstated and misleading.

The Court is not yet in a position to decide the issue of whether certain defendants violated Section 17(a)(2) and Rule 10b–5(2) by failing to disclose their intent to reloan substantial amounts of the money borrowed from Ohio to third persons or to other defendants. Since the facts regarding this reloaning activity are apparent on the face of the record the Court will decide this question as a matter of law, upon submission, within thirty (30) days of this Opinion and Order, of supplemental memoranda by the parties affected by this question. Upon timely motion and for good cause shown, the Court will hear limited testimony on this point as well, but expects such evidence as well as all other evidence to be terse and to the point.

The plaintiff Commission and the Crofters defendants shall also submit supplemental memoranda, within thirty (30) days of the filing herein on whether these defendants violated Section 15(a) of the Exchange Act of 1934 by failing to register as brokers as alleged in Count V of the complaint. Limited testimony upon this point, as well, will be heard, again upon motion and for good cause shown.

Several civil damage suits have been filed by the State of Ohio against some of the same defendants now before the Court. See State of Ohio v. Crofters, Inc., et al., Civil No. 72–81 (S.D.Ohio, E.D.); State of Ohio v. Crofters Inc., et al., Civil No. 72–138 (S.D.Ohio, E.D.). Those cases present claims which are distinct from the ones we have decided today. Nothing contained herein shall be construed as intimating a view on the final resolution of those cases or as necessarily affecting the rights of the par-

ties in other proceedings now pending before the Court.

Wherefore, for the reasons set forth above, the S.E.C.'s motion for a preliminary injunction, as deemed a motion for a temporary restraining order, within the meaning of the National Securities Acts, see III Loss, *supra*, at pp. 1977–1980, is hereby granted as against all defendants at bar. Said defendants are hereby temporarily restrained from violating the provisions of Section 17(a)(1) and (3) of the Securities Act of 1933 and Section 10(b) and Rule 10b–5(1) and (3) thereunder of the Exchange Act of 1934. The motion for summary judgment of defendant King Resources is meritorious and is hereby granted. Defendant King Resources is therefore dismissed from this action. The motions for summary judgment of defendants Crofters, Deegee, Regency Acceptance, Donahue, Griffith, Groban, Consolidated, Trueblood, Kerr, Clark and Coffey are without merit and are hereby denied. The cross motions for summary judgment of the S.E.C. as against defendants Consolidated, Trueblood, Kerr and Clark are, to the extent indicated above, meritorious and are granted in part.

It is so ordered.

## On Applications for Stay

This matter is before the Court on the applications to stay proceedings filed by defendants John M. King and William V. Coffey. These defendants have filed, contemporaneously with the applications herein, notices of appeal to the Court of Appeals for the Sixth Circuit from our Temporary Restraining Order of August 10, 1972. Plaintiff Securities and Exchange Commission (SEC) have informed this Court of their intent to oppose said applications to stay proceedings.

We note that we have set this matter, in accordance with our Order of August 10, 1972, for a consolidated hearing, pursuant to Rule 65(a) Fed.R.Civ.Pro., on the plaintiff's application for a preliminary and permanent injunction. This hearing is now scheduled for October 10, 1972. The Court expects to dispose at that time of certain questions of a factual nature relating to these moving defendants which could not have been disposed of in our earlier Order.

 Defendants King and Coffey have argued that our Order of August 10, 1972, was, in effect, a preliminary injunction. Assuming *arguendo* that their contention is correct, their appeal from that Order is still interlocutory in nature and reviewable on an abuse of discretion rubric. See Bradley v. Milliken, 433 F.2d 897 (C.A.6 1970); Cowden Mfg. Co. v. Koratron Co., 422 F.2d 371 (C.A.6 1970), cert. denied 398 U.S. 959, 90 S.Ct. 2173, 26 L.Ed.2d 544 (1970); Consolidation Coal Co. v. Disabled Miners of So. W. Va., 442 F.2d 1261 (C.A.4 1971).

 While ordinarily the filing of a notice of appeal operates to transfer jurisdiction of a case from the District Court to the Court of Appeals, see Hogg v. United States, 411 F.2d 578 (C.A.6 1969); Cleveland-Cliffs Iron Co. v. Grosse Ile Bridge Co., 239 F.Supp. 872 (S.D.Mich.E.D.1964), the rule is otherwise in situations involving interlocutory appeals from preliminary injunctions. See Rule 62(a)(c), Fed.R.Civ.Pro.; Foote v. Parsons Non-Skid Co., 196 F. 951 (C.A.6 1912); Janousek v. Doyle, 313 F.2d 916 (C.A.7 1963). As the Court noted in Foote v. Parsons Non-Skid Co., *supra*, relying on the predecessor of Rule 62(a), Fed.R.Civ.Pro.:

"[a]n appeal from a motion granting a preliminary injunction does not have the effect to remove the cause to this court, but the cause generally remains in the court below, and continues in the control of that court.".

Also see Janousek v. Doyle, *supra*, 313 F.2d at 920–921, and cases cited therein.

This Court therefore has the discretion of granting the stay requested in defendants' applications.

 In exercising our discretion, under Rule 62(c), to stay the proceedings as to matters not currently pending before the Circuit Court, we are of the opinion that defendants' applications should be denied. The factual questions still before us should be resolved as they are not in a posture, at present, for disposition by an appellate court. If resolved against defendants herein, these remaining issues could be, theoretically, adequate to support a premanent injunction regardless of the outcome of matters decided in our Order of August 10, 1972, which are now pending before the Sixth Circuit.

 Our denial of defendants' applications for stay is consistent with the rule that "an appeal from the denial or granting of a temporary injunction should not ordinarily delay the final trial of the case on its merits," Nalco Chemical Co. v. Hall, 347 F.2d 90, 92 (C.A.5 1965); United States v. Lynd, 321 F.2d 26 (C.A.5 1963); also see Mailloux v. Kiley, 436 F.2d 565 (C.A.1 1971); Securities and Exchange Commission v. Charles Plohn & Co., 433 F.2d 376 (C.A.2 1970); Hamer v. Campbell, 358 F.2d 215 (C.A.5 1966), cert. denied 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966); and with the general and strong federal policy against the allowance of "piecemeal" appeals. See Switzerland Cheese Association v. E. Horne's Market, 385 U.S. 23, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966); Andrews v. United States, 373 U.S. 334, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963); Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, 9 L.Ed. 233 (1955).

Accordingly, defendants' applications for stay of proceedings are without merit and the same shall be and are hereby denied.

It is so ordered.